**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Noble R. STARNES and Clifford Roland,**
**Defendants-Appellants.**

**Nos. 80–1437, 80–1438.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 7, 1980.

Decided March 20, 1981.

Rehearing and Rehearing En Banc
Denied April 21, 1981.

674

Julius L. Echeles, Jeffrey B. Steinback, Chicago, Ill., for defendants-appellants.

Clifford J. Proud, Asst. U. S. Atty., East St. Louis, Ill., for plaintiff-appellee.

Before CUMMINGS and WOOD, Circuit Judges, and CAMPBELL, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

Defendants Noble Starnes and Clifford Roland appeal from a jury verdict that found them guilty of violating 18 U.S.C. § 1962(d), a provision of the Racketeer Influenced and Corrupt Organizations Act (RICO). The indictment charged that Starnes and Roland violated RICO by conspiring to engage in a pattern of racketeering in connection with a scheme to commit arson with intent to defraud an insurer, in violation of Illinois law. The arson consisted of setting fire to a building that housed Tri-No Enterprises, Inc., a business of which Starnes was president. In addition, the jury found Roland guilty on a separate count of violating the Travel Act, 18 U.S.C. § 1952(a), by travelling across state lines to commit the arson.[1]

Defendants do not contest that they arranged to set the fire and that Starnes filed a claim for the resulting damage with Tri-No's insurer. Instead, Starnes and Roland argue that the evidence is insufficient to establish the intent necessary to sustain their convictions. Alternatively, they contend that if the requisite intent existed a RICO prosecution cannot be brought in connection with a single instance of arson. Defendants also argue that their rights were violated when the prosecution failed to procure for them handwritten notes allegedly taken by an FBI agent while questioning a witness. In addition, Starnes and Roland claim that the district judge was unfairly biased against them, and Starnes asserts that he failed to receive effective assistance of counsel. We affirm.

I.

In 1977, Roland operated a tavern in Gary, Indiana, and also conducted a legitimate demolition business. During December of that year, Roland told Gerald Shurman about a friend of Roland's who wanted to set fire to an office in Illinois in order to destroy records contained in the office. Shurman is a former policeman who was convicted of a felony prior to the events in this case. He had on occasion worked with Roland in the latter's demolition business. Roland offered Shurman approximately two thousand dollars in return for his services in setting the fire. Shurman enlisted the aid of an acquaintance, Donald Murphy,[2] and the two men met with Roland at

* Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

1. Starnes was sentenced to six years imprisonment and fined $5000.00. Roland received the same sentence as Starnes on the RICO charge, and a concurrent term of five years imprisonment and $5000.00 fine on his conviction under the Travel Act.

2. Shurman and Murphy testified at trial. They were named with Roland in both Counts of the indictment. Shurman pleaded guilty to Count

the latter's tavern to work out the details for the destruction of the office. During the conversation at the tavern, Roland received and made telephone calls purportedly to the individual who wanted the office burned. Telephone toll records introduced at trial showed that the calls were made to and from a telephone subscribed by Starnes in Texas.

As a result of the meeting, Shurman, Murphy and Roland agreed to travel to southern Illinois where they would set the fire as discussed. They anticipated that the fire would be blamed on the United Mine Workers who were on strike in southern Illinois at the time. The union members worked for some of Tri-No's suppliers, but not directly for Tri-No. It was agreed that the fire had to be set soon, since there was news that the strike would end within a few days.

The three men purchased thirty gallons of flammable lacquer thinner with money supplied by Roland, and set out from Gary at dawn for their destination,[3] a building in the Royal Oaks business complex in Herrin, Illinois. Starnes greeted them when they arrived at the building. Shurman recognized Starnes as a person he had seen before with Roland at Roland's bar.

Starnes informed them that he wanted the entire building destroyed rather than just a single office. The men removed a number of items from the building and obtained additional flammable liquids. They delayed igniting the fire until darkness, leaving Starnes the opportunity to board an airplane flight out of state in order to establish an alibi. The fire then was set.

Starnes had increased his insurance coverage on the building shortly before the fire. Two of Tri-No's creditors testified that Tri-No was not paying its bills to them and that the creditors had filed suit to recover the money due.

II.

A. Roland first argues that his actions did not constitute a crime because, he says, the government did not prove that he helped set the fire with the intent to defraud an insurer, as required under relevant Illinois law. Ill.Rev.Stat. Chap. 38, § 20–1(b).[4] Starnes contends that he also did not have the requisite intent, and that even if he did he cannot be convicted of conspiracy since none of the others thought that the office fire was started for the purpose of defrauding Starnes's insurer. He argues that he cannot be convicted for conspiring to defraud an insurer with people who do not possess the requisite intent to commit the crime. Defendants' contentions thus depend on whether or not they possessed the intent required by law.

Circumstantial evidence may be used to prove a defendant's intent; indeed, that usually is the only evidence available to show intent. *United States v. Haldeman*, 559 F.2d 31 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *People v. Berland*, 74 Ill.2d 286, 308, 24 Ill.Dec. 508, 385 N.E.2d 649 (1978) (arson case).

There was sufficient evidence to show Starnes's intent to defraud the insurance company. His business was in need of cash to pay its bills. Starnes, who was president of Tri-No, was well aware that the building was insured and that he recently had increased the insurance coverage. A successful fire was a convenient solution to his financial problems. He had an adjuster file a claim with the insurer after the fire, even though he was aware he

I. Murphy pleaded guilty to Count II. Charges on the remaining Count for each of the men were still pending at the time of trial.

3. The exact destination apparently was kept from Shurman and Murphy until they were nearly there.

4. Ill.Rev.Stat. Chap. 38, § 20–1 ("Arson") provides, in pertinent part:

> A person commits arson when, by means of fire or explosive, he knowingly:
>
> * * * * * *
>
> (b) With intent to defraud an insurer, damages any property or any personal property having a value of $150 or more.

had no basis for the claim under the policy since he was responsible for the fire being set. Taken together, this was ample evidence from which the jury could infer that Starnes possessed the requisite intent. *See generally, People v. Berland, supra,* 74 Ill.2d at 308–09, 24 Ill.Dec. 508, 385 N.E.2d 649.

Our attention turns, then, to whether the evidence sustains the jury's determination that Roland organized the setting of the fire with intent to defraud an insurer and thus conspired with Starnes and the others as charged. As with Starnes, we conclude that the evidence was sufficient to sustain the jury verdict.

Shurman testified that he had seen Starnes and Roland at the latter's bar long before the arson was contemplated. Roland was the "middle man" in this operation and played the key role in obtaining the services of those who would set the fire. He was in telephone contact with Starnes while Shurman and Murphy laid plans with him for burning the office. This evidence suggests that Roland was privy to Starnes's reasons for setting the fire.

In addition to the evidence regarding Roland's relationship with Starnes, there are other circumstances from which the jury could infer Roland's criminal intent as charged. Roland was a businessman and it is reasonable to conclude that from his own experience he knew that commercial buildings usually are insured. The jury was justified in concluding that Roland would know that Starnes expected to recoup his losses on the building by collecting insurance money. Setting fire to a building, even if intended to be confined only to records in a single office, entails tremendous risk of financial loss, especially considering the amount of flammable liquid the conspirators originally purchased. A jury could reasonably infer that it must have been obvious to Roland that Starnes would not be paying him to cause him (Starnes) great financial loss by burning his own business down for some farfetched public relations gimmick, or any other reason, unless Starnes had insurance to cover the property loss and otherwise make it all financially worthwhile.

Moreover, several weeks after the blaze Roland told Shurman that the latter would receive full payment "after the insurance settlement was made on the building." The testimony does not suggest that either Shurman or Roland expressed surprise that an insurance claim was involved. Given Roland's business background, the context of his statement to Shurman supplies additional support for the jury's conclusion that Roland intended to defraud Starnes's insurer.

That Roland told Murphy and Shurman only that the United Mine Workers were to be blamed for the fire does not alter the sufficiency of the evidence as to his intent. Murphy and Shurman did not testify that blame was to be placed on the union solely for the purpose of making that organization look bad. Rather, their testimony more plausibly suggests that the strike provided a convenient cover for those who burned the Tri-No offices, diverting attention from the real reasons for the fire. That was why defendants had to move fast in order to take advantage of the timing of the strike, which was about to end.

The evidence sustains the jury's conclusion that Starnes and Roland intended to defraud Starnes's insurer when they conspired to set the fire.

B. Starnes and Roland argue that they could not have conspired to conduct a "pattern" of racketeering activity under RICO since a pattern requires at least two separate racketeering acts as defined by the statute. They contend that since the offense charged involves a single instance of arson no "pattern" of racketeering exists in this case.

Acts of racketeering under RICO include arsons punishable under state law by imprisonment for more than one year, 18 U.S.C. § 1961(1)(A), and crimes indictable under federal mail fraud laws or federal laws that prohibit interstate travel with intent to commit arson, 18 U.S.C. § 1961(1)(B). Each of those acts is a separate instance of racketeering activity under

RICO. When two or more of those acts are connected to each other in some logical manner so as to effect an unlawful end, a pattern of racketeering exists. 18 U.S.C. §§ 1961(5), 1962(d). *E. g., United States v. Stofsky*, 409 F.Supp. 609, 614 (S.D.N.Y. 1973). *See United States v. Weatherspoon*, 581 F.2d 595, 601 n.2 (7th Cir. 1978). The RICO provisions are violated when there is a conspiracy to commit more than one of those acts, i. e., a pattern of racketeering directed at an enterprise's affairs.

■ Defendants' argument that RICO cannot apply to a conspiracy to commit a single arson ignores the statutory scheme just described. While there may indeed have been a single scheme or objective of the conspiracy—the arson—it turned out that several acts of racketeering were contemplated to achieve that objective. Under RICO, the conspiratorial *objective* is a matter different than the *acts* contemplated by the conspirators. Those acts in this case include Roland's travelling with Shurman and Murphy from Indiana to Illinois so they could set the fire in order to defraud the insurer; actually setting the fire in order to defraud the insurer; and then using the mails to complete the fraudulent scheme. Each is a separate act of racketeering.

■ This circuit previously has considered the position defendants advance. In *United States v. Weatherspoon, supra*, the defendant argued that all the mailings for which she was indicted under RICO arose from a single scheme to defraud the Veterans Administration, and thus were not a part of a "pattern" of racketeering. 581 F.2d at 601–02. The court disagreed, finding no support for the argument that RICO "require[s] a showing of separate and unrelated schemes, as a precondition for finding two indictable 'acts' under 18 U.S.C. § 1341 [mail fraud] that would constitute a 'pattern of racketeering activity' under [RICO]." 581 F.2d at 601 n.2. Thus, the fact that there is but one objective underlying the separate acts does not diminish the applicability of RICO to those acts.

Other courts that have considered the application of the "pattern" provisions of RICO have interpreted the statute in the same manner as we do. For example, in *United States v. Chovanec*, 467 F.Supp. 41 (S.D.N.Y.1979), the court concluded that a single objective to defraud a single victim constituted a RICO offense, when the objective was carried out through several incidents of wire fraud. 467 F.Supp. at 44. *Compare United States v. Parness*, 503 F.2d 430 (2d Cir. 1974) (interstate transport of stolen securities as part of single scheme to defraud). *Cf. United States v. Anderson*, 626 F.2d 1358, 1371 (8th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981) (dictum disapproving "The Government's view . . . [which] leads to the conclusion that almost any two criminal acts affecting interstate commerce would fall within the ambit of RICO").

We reject defendants' argument that the acts involved in this case do not support the jury's verdict that Starnes and Roland conspired to engage in a pattern of racketeering activity.

C. Defendants contend that there existed no legitimate enterprise in the affairs of which they participated as required by RICO.[5] Starnes and Roland argue that they conspired only to set the fire, which activity they seek to distinguish from participation in Tri-No's business affairs. Their association, they say, was for a wholly illegitimate purpose. Thus, defendants focus on an interpretation of RICO that would exclude associations for purely illegitimate purposes from the coverage of the statute. *Compare United States v. Aleman*, 609 F.2d 298 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980) (RICO covers wholly illegitimate enterprises) *with United States v. Turkette*,

5. The pertinent RICO provision is contained in 18 U.S.C. § 1962(c), and reads as follows:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

632 F.2d 896 (1st Cir. 1980), *cert. granted*, —— U.S. ——, 101 S.Ct. 938, 66 L.Ed.2d —— (1981) (RICO covers only infiltration of legitimate organizations).

The government maintains here, as it did at trial, that the "enterprise" involved in this case is Tri-No itself. The focus of the government's case is on the conspiracy as it affected Tri-No's business operations. Starnes participated directly in Tri-No's affairs, says the government, since he was president of the corporation and the arson conspiracy affected business property and insurance coverage. Roland was involved indirectly in Tri-No's affairs, the government contends, because the damage to the building was meant to affect the conduct of corporate business. The government argues that since this case was tried on the basis of the conspirators' participation in the affairs of a legitimate business, there is no reason to consider whether an association solely for illegitimate purposes falls within the terms of RICO. We agree with the government's position and conclude that the evidence is sufficient to establish that Starnes and Roland participated in Tri-No's affairs sufficiently to bring them within the grasp of RICO.[6]

The evidence shows Roland knew that the arson was meant in a literal way to affect the conduct of Tri-No's business. To begin with, Roland had known Starnes for some time and was aware from the start that it was Tri-No's office complex that was to be the site of the arson. It obviously is difficult to operate a business from a burned-out office. Even if we were to assume that the purpose of the arson was only to embarrass the striking union by placing blame for the fire upon it—as defendants argue and we reject—the conspiracy still would be directed to at least one aspect of Tri-No's business conduct: namely, its relations with union-staffed suppliers. As it is, the destruction of Tri-No's business property in order to unlawfully obtain an insurance settlement bears significantly on the corporation's affairs, especially in light of financial difficulties the firm was experiencing.

The participation in the conspiracy of people who were not on the legitimate payroll of Tri-No does not mean those people were not participating in its affairs. The nature of racketeering connections to an otherwise legitimate business suggests that elements outside a company may assist in obtaining the company's illegal goals. Thus "[t]he substantive proscriptions of the RICO statute apply to insiders *and outsiders*—those merely 'associated with' an enterprise—who participate directly *and indirectly* in the enterprise's affairs through a pattern of racketeering activity. [Citations omitted.] Thus, the RICO net is woven tightly to trap even the smallest fish, those peripherally involved with the enterprise." *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir.), *cert. denied sub nom., Delph v. United States*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978) (emphasis in original).

Tri-No was the enterprise involved in this case. Starnes participated in its affairs directly, including the arson, as the corporation's president. Roland's part in the conspiracy involved his role in Tri-No's unorthodox disposition of its business property and the corporation's resulting insurance claim. The acts of racketeering required the conspirators' direct and indirect participation in the conduct of Tri-No's affairs, and fell within the proscriptions of RICO.[7]

6. Defendants would fare no better even if we accepted their promise that this case concerns the activities only of an illegitimate enterprise. As noted, this circuit has held that RICO covers the activities of a wholly unlawful association. *United States v. Aleman, supra*, 609 F.2d at 304–05. There is ample evidence to sustain the conviction on the basis of participation in an illegitimate undertaking.

7. Starnes and Roland also contend that application of RICO penalties is inconsistent with the philosophy underlying a recent Supreme Court case considering the use of penalty enhancement provisions in the context of double jeopardy claims. As this court previously has noted, RICO is a penalty enhancement scheme unique unto itself and must be interpreted in the context of the evils it seeks to redress—racketeering activity indictable under separate laws. *United States v. Aleman*, 609 F.2d 298, 304, 306 (7th Cir. 1979), *cert. denied*, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980). *See generally* W. Hurst, Statutes in Court 141–43

Roland claims that he did not travel interstate with the requisite intent to promote the arson and thus his conviction under Count II of the indictment for a violation of the Travel Act cannot stand. The circumstances of the conspiracy as discussed earlier show that Roland travelled from Indiana to Illinois in order to set the fire with the intent to defraud Tri-No's insurer. There is sufficient evidence to support Roland's conviction under Count II of the indictment.

III.

A. Roland and Starnes contend that their rights were violated when the prosecution failed to turn over the original handwritten notes allegedly taken by an FBI agent during interviews with the government's witness, Shurman. The prosecutor apparently did not have the notes in his possession even if they still existed. Defendants contend that this violated their rights under the Jencks Act, 18 U.S.C. § 3500, and *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). They argue that since the withholding of exculpatory evidence may be reversible error even if done by someone other than the prosecutor, the prosecutor's statement was inadequate to safeguard their rights.

During his testimony, Shurman mentioned that Agent Little had taken notes while interviewing him. The formal FBI report on those interviews had been turned over to Roland and Starnes before trial. When defendants sought production of the original notes to supplement the single report already obtained, the prosecutor responded that "[t]hey have every piece of information that the United States Attorney's Office has, Your Honor, and [the single report is] the only one we have." The district judge then told counsel that "maybe we can have a hearing on it or something, out of the presence of the jury, of what to do if [the prosecutor] don't have it." There is no indication in the record that defendants ever sought such a hearing, and none was held. The record also does not disclose any other effort by defendants to discover whether or not the notes in fact existed, a doubt implied by the prosecutor's comment that he also did not have the notes. Agent Little was not called by the defense to answer questions on this matter, although the district court clearly presented that possibility to defendants. FBI Agent Dueker, the chief agent on the case, was called as a defense witness but he was not asked about the existence or whereabouts of the original notes.

There is nothing in this record that suggests the notes could be in some way material to issues involved in the case, as required under *Brady. See United States v. Crowell,* 586 F.2d 1020, 1029 (4th Cir. 1978). Nor did Roland and Starnes attempt to determine that the notes were still in existence and thus obtainable by the prosecutor. The record here is insufficient to establish an issue as to a violation of defendants' *Brady* rights. We decline to decide the question. *Cf. United States v. Gray,* 611 F.2d 194, 197 (7th Cir. 1979), *cert. denied,* 446 U.S. 911, 100 S.Ct. 1840, 64 L.Ed.2d 264 (1980) (declining review where factual basis for constitutional claims not before district court).

The record does not support the contention that the notes would have been

(1970). Defendants' citation of *Busic v. United States,* 446 U.S. 398, 100 S.Ct. 1747, 64 L.Ed.2d 381 (1980), is inapposite in this case.

The *Busic* case held that if a statute defining a felony provides for enhanced penalties for use of a weapon in committing the crime, a sentence given under that statute may not be further enhanced by application of separate statutory provisions permitting enhanced penalties generally for such use of a weapon. The Court in *Busic* did not question the penalty-enhancement provision as applied to the underlying felony. Nor did the Court question the constitutionality of the separate penalty-enhancement provision as applied to a felony law lacking its own enhancement clause. Double-enhancement is not present in this case. Rather, we deal here with a single statute aimed at enhancing the usual penalties available under state or federal law for acts associated with racketeering. *Aleman, supra,* 609 F.2d at 306–07. There is no *Busic* situation implied by the facts of this case.

producible under the Jencks Act. That Act would require production in this case only if the notes were a substantially verbatim transcript of Shurman's remarks, or were his own written statements adopted or approved by him. 18 U.S.C. § 3500(e). If anything, the record indicates that the notes did not fall within either category, and thus there was no error under the Jencks Act in defendants' failure to obtain the notes.

B. Starnes argues that he was denied the effective assistance of counsel. The only evidence of ineffective assistance to which he directs our attention is his counsel's jocular comment outside the presence of the jury during an instruction conference that Starnes's defense was "temporary insanity."

While Starnes is correct that loyalty and respect must underlie the attorney's relationship to his or her client, there is no indication that those qualities were not present in this case. The offending comment apparently was made to ease the course of a lengthy discussion on the propriety of certain jury instructions. It does not represent such an "utter perversion of the attorney-client relationship" that we need not consider counsel's actual trial performance. *Messelt v. Alabama*, 595 F.2d 247, 251 (5th Cir. 1979) (attempt by counsel to have additional charges brought against his client "in an effort to gain more leverage in collecting his fees").

The record taken as a whole does not indicate that Starnes's counsel lacked the experience or ability to adequately represent Starnes so as to fail to meet the "minimum standard of professional representation." *United States ex rel. Williams v. Twomey*, 510 F.2d 634, 641 (7th Cir. 1975), *cert. denied sub nom., Sielaff v. Williams*, 423 U.S. 876, 96 S.Ct. 148, 46 L.Ed.2d 109 (1976); *United States v. Chaussee*, 536 F.2d 637 (7th Cir. 1976). To the contrary, the record shows that counsel conducted deft examination of the witnesses, was attentive to and took successful advantage of opportunities to object to the admission of damaging evidence, and presented the facts favoring his client in a thorough and professional manner during opening statements and closing arguments. His statement during the instructions conference does not justify a finding that Starnes did not have the effective assistance of counsel at trial.

C. Defendants argue that the district judge's inquiry about the possibility of defendants' pleading guilty deprived them of a fair trial. The judge's comments were made out of hearing of the jury during a discussion of the admissibility of certain evidence. The claim of prejudice is without merit.

The district judge's first comment as to the possibility of a plea, to which he did not receive a clear reply, was directed at determining whether or not an extensive voir dire of Shurman would be necessary on the subject of payments made to him by Roland. The evidence was to apply to Roland on Count II of the indictment, which did not name Starnes. Shurman himself had not pleaded guilty on that Count, although he had pleaded guilty on Count I.

Judge Foreman was concerned that the evidence, which could be prejudicial to both Starnes and Shurman, should not be presented if a plea was in the offing. Nothing in the trial record or argument on appeal suggests that Judge Foreman was expressing a view on Roland's and Starnes's guilt.

Shortly after his first question regarding pleas (two pages later in the trial transcript and still out of the jury's hearing), Judge Foreman again asked whether a plea was likely. This was not unreasonable, since counsel had not answered him the first time and the evidentiary question had been only tentatively resolved.

While it is true that a judge's attitudes may have subtle as well as overt influence upon a jury, the record does not indicate the possibility of either sort of influence to the prejudice of defendants. Judge Foreman's remarks were made out of the jury's hearing, and the record indicates that his rulings throughout the trial were even-handed and solicitous of defendants' rights. Thus, the

case before us is unlike *United States v. Dellinger*, 472 F.2d 340, 386–89 (7th Cir. 1972), *cert. denied*, 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973), cited by defendants, where the judge's prejudicial comments were made before the jury, pervaded the trial, and were reflected in less than even-handed evidentiary and other rulings. *Compare Bollenbach v. United States*, 326 U.S. 607, 66 S.Ct. 402, 90 L.Ed. 350 (1946) (broad hints to jury, clearly prejudicial to the defendant, that they must quickly return a verdict rather than remain deadlocked).

Affirmed.