STATE FARM FIRE AND CASUALTY COMPANY, Plaintiff,

v.

ESTATE OF Douglas D. CATON, Deceased, and James Caton, Defendant.

No. S 81-178.

United States District Court, N. D. Indiana, South Bend Division.

June 9, 1982.

Thomas H. Singer, South Bend, Ind., for plaintiff.

James F. Groves, Gerald Sakaguchi, South Bend, Ind., for defendant.

## MEMORANDUM AND ORDER

SHARP, Chief Judge.

This cause is before the Court pursuant to the Organized Crime Control Act of 1970, 18 U.S.C., § 1961 *et seq.*, (hereinafter RICO), specifically section 1964(c) which creates a civil cause of action. This memorandum disposes of all pending motions to dismiss and for summary judgment and contains all necessary findings of fact and conclusions of law so as to comport with Federal Rules of Civil Procedure 56.

## FACTUAL BACKGROUND

On March 13, 1981 Douglas D. Caton, James Caton, Marion Comadoll, Cheryl Melton and Boyd Howard were indicted in this Court under 18 U.S.C., § 1962(c) and (d) (RICO), 18 U.S.C., § 1341 (mail fraud), I.C. § 35–16–1–1 (arson), 18 U.S.C., § 1951 (extortion), and 26 U.S.C. § 7206(1) (income tax evasion). The factual underpinnings alleged an elaborate arson-for-profit scheme whereby fires were set, and fraudulent insurance claims and fraudulent repair estimates and claims, were filed with the respective insurance companies. The perpetrators allegedly received approximately $277,000.00 in fraudulent settlements.

On June 4, 1981 Douglas D. Caton, James Caton, Cheryl Melton and Marion Comadoll were found guilty by a jury in this Court of violating 18 U.S.C., § 1962(c) and (d) and 18 U.S.C., § 1341. Boyd Howard was found not guilty. These defendants were sentenced accordingly on July 17, 1981. Douglas D. Caton posted bond and was released pending appeal.

On June 5, 1981 State Farm Fire and Casualty Insurance Company (hereinafter State Farm) filed a civil action under 18

U.S.C. § 1964(c) requesting treble damages in the approximate amount of $46,000.00. State Farm had been the victim of a fraudulent settlement claim in conjunction with the arson of a house located at 306 E. Fox Street, South Bend, Indiana. The complaint named Douglas D. Caton, James Caton, Marion Comadoll, Cheryl Melton and Boyd Howard as defendants.

On June 16, 1981 Douglas D. Caton filed a separate interpleader action pursuant to Federal Rules of Civil Procedure 22 against ten insurance companies, including State Farm. Caton established a restitutionary fund in the amount of his base liability, exclusive of treble damages, costs, and attorney fees. On June 20, 1981 Caton filed an answer to State Farm's complaint alleging that the interpleader action barred State Farm's claim. All of the defendants in the interpleader action filed answers and counterclaims for full relief under 18 U.S.C., § 1964(c) (i.e. treble damages, interest, costs and attorney fees). Seven of the insurance companies named in the Caton interpleader action moved to intervene in *State Farm v. Caton*, Civil number S 81–178, and said motions were granted. Then on November 24, 1981, the Court, on its own motion, consolidated both suits, numbers S 81–178 and S 81–220 for all further proceedings and trial.

On November 21, 1981 Douglas D. Caton was found murdered in Las Vegas, Nevada, with a single bullet through the back of his head. A memorandum and suggestion of death were subsequently filed and the Court ordered the Estate of Douglas D. Caton substituted for Douglas D. Caton in these consolidated actions on December 21, 1981.

On or about December 16, 1981, counsel for Douglas D. Caton filed a motion in the United States Court of Appeals for the Seventh Circuit seeking abatement of the proceedings in the appeal of the underlying criminal conviction. The Seventh Circuit Court of Appeals granted said motion on January 21, 1982, and ordered all proceedings abated *ab initio* and dismissed the appeal.

On February 22, 1982 a default judgment was granted in favor of State Farm as to Marion Comadoll and Boyd Howard and denied as to Cheryl Melton and James Caton. On February 24, 1982 State Farm filed a motion for severance of its claims from those of the other insurers due to the likely settlement of claims by the other defendant insurance companies. The motion for severance was granted on March 1, 1982. The case of *State Farm v. the Estate of Douglas D. Caton, et al.* would proceed under the cause number S 81–178 and the remaining parties would proceed in the original interpleader action under cause number S 81–220.

It is in this posture that the Court now considers the issues raised by the pending motions.

I.

■ The first question to be answered is whether a civil RICO action can be brought under 1964(c) when it is not supported by a criminal conviction. Defendant argued to the Court, both in his brief and during oral argument, that one consequence of the abatement of his criminal prosecution was that this civil action could no longer be maintained, since a civil action could only be brought against a person previously convicted in a criminal prosecution of a violation of RICO. Plaintiff contends that defendant has misconceived the nature of a RICO civil action.

"In determining the scope of ... [RICO, it is proper to] look first to its language." *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). The "literal meaning of the words employed," *Flora v. United States*, 357 U.S. 63, 65, 78 S.Ct. 1079, 1081, 2 L.Ed.2d 1165 (1958), seem clear enough. Section 1964(c) refers to a "violation" of the standards of Section 1962, not to the criminal penalties of Section 1963. Section 1962 says that acts in violation of it are "unlawful," not criminal. Criminal and civil sanctions are applied to violations of Section 1962 by Section 1963 (criminal) and Section 1964 (civil). Defendant has misread the statute. There

is no reason to "depart from and limit the statutory language." *United States v. Turkette, supra,* 101 S.Ct. at 2527 (apropos of scope of "enterprise").

In *United States v. Cappetto,* 502 F.2d 1351 (7th Cir. 1974), *cert. den.,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975), the government began an injunctive action against the defendant under Section 1964(a) and (b). Section 1964(a) grants civil jurisdiction to federal courts to prevent and restrain "violation of 1962"; the government in Section 1964(b) is explicitly authorized to "institute proceedings" under Section 1964(a). No prior criminal conviction had been obtained. The court observed:

> [A]cts which may be prohibited by Congress may be made subject to both criminal and civil proceedings, and the prosecuting arm of the government may be authorized to elect whether to bring a civil or criminal action, or both. A civil proceeding to enforce those acts is not rendered criminal in character by the fact that the acts are also punishable as crimes. 502 F.2d at 1357.

In *Farmers Bank of State of Delaware v. Bell Mortgage,* 452 F.Supp. 1278 (D.C.Del. 1978), a private civil damage action was brought under Section 1964. The defendant objected that he had "not [been] convicted...." 452 F.Supp. at 1279. The court held:

> Section 1964(c) ... does not condition ... [a] cause of action in any way upon a previous conviction under the criminal provisions of the statute. It is only necessary that the plaintiff prove elements of the Act by a preponderance of the evidence in order to be awarded damages in a civil action. 452 F.Supp. at 1280.

The court cited *Cappetto, supra,* as authority for its holding. *Farmers Bank* has, moreover, been followed in *Heinold Commodities, Inc. v. McCarty,* 513 F.Supp. 311, 313–314 (N.D.Ill.1979) (Judge Decker), and *Parness v. Heinold Commodities, Inc.,* 487 F.Supp. 645, 647 (N.D.Ill.1980) (Judge Bua).

At various times defendants have argued that plaintiff's complaint does not state a cause of action. The "accepted rule [is]

that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1975). To determine the scope of RICO, it is, as noted above, first necessary to examine its "language." *United States v. Turkette, supra.* Section 1964(c) authorizes "[a] person injured in his business or property by reason of a violation of Section 1962 ..." to "sue ...." Recovery includes treble damages. *Id.* "Person" is defined to include "any ... entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). The plaintiff, State Farm, is, of course, such an entity. The money allegedly obtained by the defendant through his acts of arson, fraud and racketeering "injured" State Farm both in its insurance "business" and its "property". At the very least, its "monetary" loss constituted "injury" under Section 1964(c). Section 1962 is, moreover, violated by "any person" "associated with any enterprise ... the activities of which affect ... commerce, conduct[ing] ... [the] enterprise's affairs through a pattern of racketeering activity ...." 18 U.S.C. § 1962(c). The definition of "person" includes "any individual". 18 U.S.C. § 1961(3). Defendants J. Caton and Melton are individuals. The estate is an entity capable of holding an interest in property. "Enterprise" is defined to include "any ... individual. This was a sole proprietorship." 18 U.S.C. § 1961(4). See, *United States v. Elliott,* 571 F.2d 880, 898, n.18, (5th Cir.) ("The number of persons making up an enterprise is irrelevant...") *cert. den.,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). Caton's business activities in the rental and construction fields, which clearly affected commerce, were such an enterprise. "Pattern[ed] activity means activity that is not "isolated" or "sporadic", but is continu[ous] and relat[ed]." S.Rep.No. 91–617, 91st Cong. 1st Sess. 158 (1969), U.S.Code Cong. & Admin.News 1970, p. 4007; see *United States v. Weisman,* 624 F.2d 1118, 1121–1123 (2d Cir. 1980). Finally, "racketeering

activity" may be conducted "through" offenses such as "arson" and "mail fraud." 18 U.S.C. § 1961(1)(A) and (B). See *United States v. Starnes*, 644 F.2d 673 (7th Cir. 1981); *United States v. Hansen*, 583 F.2d 325 (7th Cir.), *cert. den.*, 439 U.S. 912, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978); *City of Milwaukee v. Hansen*, Civil No. 77–C–246 (E.D.Wis.1981). The application of RICO to the fact pattern described in the complaint is wholly appropriate. Therefore, the Court must conclude that this cause is properly brought as a civil action subject to the civil burden of proof.

## II.

The next question which must be answered is whether a civil RICO action survives the death of the wrongdoer, and if so, to what extent.[1] RICO contains no provision regarding survival or abatement of a cause of action brought under it. Nor is there any applicable general federal statute. In *Moore v. Backus*, 78 F.2d 571 (7th Cir. 1935), the late Judge Sparks outlined the approach which still prevails:

> The federal statute [the Sherman Act] . . . is quite general in its nature, and its successful enforcement would seem to require a uniform interpretation in its application, as well as a uniform interpretation of the [question of survivability]. . . . There is nothing in the character of the legal action . . . which render[s] it local . . ., and the construction of the common law and of the statutes involved we think must come under the classification of general jurisprudence, and is to be determined by the federal courts. *Id.*, at 575.

More recently, in *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), the Supreme Court of the United States wrote

that when "actions are a creation of federal law . . . the question whether [the] action survived [plaintiff's] death is a question of federal law. [T]hat only a uniform federal rule of survivorship is compatible . . ." *Id.*, at 23, 100 S.Ct. at 1474. Lacking any expression of congressional will the Court must decide whether it is appropriate to look to state law or fashion a single federal rule to fill the interstices of RICO. In *Moore* and *Carlson*, the Seventh Circuit Court of Appeals and the Supreme Court of the United States, both recognized that the inconsistencies which could be created by the application of state law necessitated the creation of a federal law of survival. Accordingly, the issue of survival of the cause of action must be determined by federal common law.[2]

The simple but harsh 19th Century common law rule was that "[A]n injured party's personal claim was [always] extinguished . . . upon the death of either the injured party himself or the alleged wrongdoer." W. Prosser, Torts 888–891 (4th ed. 1971); *Robertson v. Wegmann*, 436 U.S. 584, 98 S.Ct. 1991, 56 L.Ed.2d 554 (1978). American courts adopted the English common law after the Revolution except as modified by statute. The general position of American courts was summarized as follows:

> They recognized the survival of actions for torts affecting personal property to the representative of a deceased plaintiff, but not as against the estate of the decedent, unless the estate was unjustly enriched by the tort so that the action could be maintained as one of quasi-contract restitution.
>
> \*  \*  \*  \*  \*  \*
>
> [T]he modern trend is definitely toward the view that tort causes of action and

---

**1.** Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee. 18 U.S.C. § 1964(c).

**2.** With exceptions not here relevant, Indiana provides for the survival of all actions. 34 Ind.Stat. 1–1–1 Burns 1973), including penal-

ties, *Davis v. State ex rel Long*, 119 Ind. 555, 22 N.E. 9, 10 (1889), a result contrary to traditional federal jurisprudence. *Schreiber v. Sharpless*, 110 U.S. 76, 3 S.Ct. 423, 28 L.Ed. 65 (1884). *But see United States v. Daniel*, 47 U.S. (6 How.) 11, 13, 12 L.Ed. 323 (1848) (no *ex delicto* action survives but different rule obtains if benefit realized by estate of wrongdoer) (dictum).

liabilities are fairly a part of the estate of either plaintiff or defendant as contract debts, and that the question is rather one of why a fortuitous event such as death should extinguish a valid action. * * * [I]t may be expected that ultimately all tort actions will survive to the same extent as those founded on contract. Prosser, *supra*, 899–900.

Justice Clark expressed similar views for the Supreme Court of the United States in *Cox v. Roth*, 348 U.S. 207, 75 S.Ct. 242, 99 L.Ed. 260 (1955):

> [W]e ... note that advancing civilization and social progress have ... include[d] in the general law the principle of the survival of causes of action against deceased tortfeasors, and that such recovery, rather than being exceptional, has now become the rule.... *Id.*, at 210, 75 S.Ct. at 244.

However, multiple damages were unknown at common law being purely a statutory creation though they have a long history in American jurisprudence. Prosser, *supra*, at 9–14.

The defendant contends simply that a civil treble damage action under RICO does not survive the death of the wrongdoer, or in the alternative if it does survive, only actual damages are recoverable. Defendant's position hinges on the contention that the treble damage provision is penal in nature and analogous to antitrust concepts.

Multiple damage provisions are difficult to categorize under the traditional headings of compensatory or punitive. There are essentially two varieties of multiple damage provisions: those designed as punishment for statutory violation; and those designed to compensate the harmed individual by providing liquidated compensation for accu-

mulated harm. Blakey, G. ed., Cornell Institute on Organized Crime, Materials on RICO 489–490 (hereinafter "materials"); *United States v. Bornstein*, 423 U.S. 303, 96 S.Ct. 523, 46 L.Ed.2d 514 (1976).

The position of the defendant is that the survivability of a RICO civil action should be analogized to Section 4 of the Clayton Act which it was modeled after.[3] Sen.Rep. 617, 91st Cong. 1st Sess. 81 (1969); H.R. Rep. 1549, 91st Cong., 2d Sess. 56–60 (1970), U.S.Code Cong. & Admin.News 1970, p. 4007. Section 4 of the Clayton Act has, however, been held to be penal in character. *Sun Theatre Corp. v. RKO Radio Pictures*, 213 F.2d 284, 287 (7th Cir. 1954) (penal for purposes of statute of limitations). As such, while the underlying cause of action survives only actual damages are recoverable, not treble damages and attorney fees. *Rogers v. Douglas Tobacco Board of Trade*, 244 F.2d 471 (5th Cir. 1957). The *Rogers* court held:

> The policy of the Federal statute, we think, requires the survival of the cause of action to the extent that actual damages may be recovered. Trebling of the damages seems to us to be in the nature of a penalty for the public wrong, and we do not think that the personal representatives would be liable for more than actual damages. *Id.*, at 483.

Like analyses and conclusions are reached in numerous antitrust cases.[4] The rationale of these cases is that treble recovery is so disproportionate to the actual loss and without statutory indication that the award is compensatory in nature, it must be considered punitive and therefore reduced to actual damages. See, *Bowles v. Farmers National Bank of Lebanon, Ky.*, 147 F.2d 425 (6th Cir. 1945) (analysis of treble damage provision of Emergency Price Control Act).

---

**3.** Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages, by him sustained, and the cost of the suit, including a reasonable attorney fee. 15 U.S.C.A., Section 15.

**4.** *Barnes Coal Corp. v. Retail Coal Merchants Ass'n*, 128 F.2d 645, 649 (4th Cir. 1942); *Hicks v. Bekins Moving and Storage Co.*, 87 F.2d 583, 585 (9th Cir. 1937); *Moore v. Backus*, 78 F.2d 571, 573 (7th Cir.), *cert. den.*, 296 U.S. 640, 56 S.Ct. 173, 80 L.Ed. 455 (1935); *Haskell v. Perkins*, 28 F.2d 222 (D.C.N.J.1928).

Plaintiff contends that analogy to antitrust law limitations is inapposite to the legislative history of RICO. Plaintiff argues that while RICO was modeled after antitrust theory it was enacted outside of the antitrust statutes so as to avoid restrictive antitrust precedent. Finally, plaintiff contends Congress has specifically denominated RICO as "remedial" and the Seventh Circuit Court of Appeals has accepted it as such. *United States v. Cappetto*, 502 F.2d 1351, 1357 (7th Cir. 1974) (Sections 1964(a) and (b) remedial and not punitive), *cert. den.*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975).

■ When the Court finds a statute ambiguous, or as here silent, the legislative history should be examined for a specific discussion of that ambiguity to resolve the matter. However, the legislative history must deal with the ambiguity in a sufficiently specific manner to be of any value. For the Court's constitutionally mandated role is that of interpreter of statutes not lawmaker and when the legislative history is so unclear as to provide only basis for speculation there is created too great an area for impermissible subjectivity. It is in those situations where any attempt to conjure up legislative history is folly and any such assertion must be ignored. Here the legislative history does address the relationship between RICO and antitrust law.

In 1967 the President's Commission on Law Enforcement and Administration of Justice reported on the problem of organized crime infiltration of legitimate business. The Commission called for the use of "regulatory devices" to combat that infiltration. *President's Comm. on Law Enforcement and Adm. of Justice, The Challenge of Crime in a Free Society*, 208 (1967) (hereinafter the Commission). In response to this report Senator Hruska introduced bills S. 2048 and 2049 in the Senate seeking to implement aspects of the Commission's recommendations. Companion legislation was introduced by Congressman Poff in the House. Both bills applied antitrust type remedies to certain activities of organized crime. 90th Cong. 1st Sess. (1967).

While no action was taken on the bills in either House of Congress, they were studied by the Antitrust Section of the American Bar Association. The Bar Association study indicated that:

The Antitrust Section agrees ... that the antitrust machinery possesses certain advantages worthy of utilization in ... [the] fight [against organized crime]. It therefore supports and endorses the principles and objections of both S. 2048 and S. 2049, and similar legislation.

However it prefers the approach of S. 2049. By placing the antitrust-type enforcement and discovery procedures in a separate statute, a commingling of criminal enforcement goals with the goals of regulating competition is avoided.

Reprinted in 115 Cong.Rec. 6995 (1969). The study also commented:

Moreover, the use of the antitrust laws themselves as a vehicle for combating organized crime could create inappropriate and unnecessary obstacles in the way of persons injured by organized crime who might seek treble damage recovery. Such a private litigant would have to contend with a body of precedent—appropriate in a purely antitrust context—setting strict requirements on questions such as "standing to sue" and "proximate cause."

Conversely, the placing of this legislation in the body of the antitrust laws could have an undesirable and inappropriate impact on the administration of the antitrust laws in their normal context. Thus, faced with litigation between private citizens and members of the organized criminal hierarchy, there may well be a natural inclination to weigh the balance heavily in favor of the private citizen. Such an imbalance, while defensible in this context, is inappropriate in the normal antitrust litigation context.

*Id.*

In 1969, Senator Hruska, building on the recommendations of the Crime Commission and the Bar Association, introduced S. 1623. 115 Cong.Rec. 6993 (1969). Senator Hruska noted the prior bills and the ABA study,

which he incorporated into the *Congressional Record.* *Id.,* at pp. 6994–96. He also expressed his hope that the provisions of S. 1623 could be made the subject of the hearings that were already underway on S. 30, 91st Cong. 1st Sess. (1969), then entitled, the "Organized Crime Control Act of 1969", and incorporated into it. Subsequently Senator John L. McClellan, the chairman of the Subcommittee on Criminal Laws and Procedures, the Subcommittee of the Judiciary Committee to which both S. 30 and S. 1623 had been referred, and Senator Hruska introduced S. 1861. 115 Cong.Rec. 9566 (1969). Senator McClellan observed:

> The bill [S.1861] draws heavily upon the remedies developed in the field of antitrust. Nevertheless, ... I believe it necessary to make several clarifying remarks on the antitrust remedies this bill provides. The first is that the equitable remedies used in the field of antitrust always existed.... [T]hey show great promise as tools for attacking organized crime. There is, however, no intention here of importing the great complexity of antitrust law enforcement into this field. * * * The many references to antitrust cases are necessary because the particular equitable remedies desired have been brought to their greatest development in this field.

115 Cong.Rec. 9567 (1969). Ultimately, S. 1861 became Title IX of the Organized Crime Control Act as it passed the Senate by a vote of 73 to one. 116 Cong.Rec. 972 (1970).

Congressman Poff was a principal spokesman for S. 30 in the House; he argued for and defended it throughout the hearings and on the House floor. He also inserted the ABA study, noted above, in the House hearings. *Organized Crime Control Hearings* before Subcommittee No. 5, Committee on the Judiciary, House of Representatives 91st Cong. 1d Sess. 147–149 (1970). In addition, the President of the American Bar Association, Edward L. Wright, testified in the House hearings, saying that the Association "strongly endorse[d] ... [the] legislation ...." *Id.,* at 538. The Association was, he said, "unqualified in its support

...." of it. *Ibid.* The Association, however, suggested a number of amendments. The amendments were not designed to weaken the bill. President Wright testified that the bill would be "either strengthened or clarified" by their adoption. *Ibid.* Noting the contribution that the work of the Association had already made to the bill in the Senate, *id.,* at 543–44, he suggested:

> An amendment to include the additional civil remedy of authorizing private [treble] damage suits based on the concept of Section 4 of the Clayton Act.

*Ibid.* The amendment was adopted, and it now appears in 18 U.S.C. § 1964(c).

The conclusions that flow from this survey of the legislative history are unavoidable. Certainly section 1964(c) was modeled after section 4 of the Clayton Act. It was, however, cast as a separate statute intentionally to avoid the restrictive precedent of antitrust jurisprudence. The members of Congress piloting this proposed legislation changed it so that it complied with the ABA's antitrust section's report suggesting the expedience of separate legislation. Further, the equitable remedies applied in the antitrust area have always been available to the Court. Therefore, to burden RICO with restrictive antitrust precedent would be contrary to the express legislative history.

The Seventh Circuit Court of Appeals has recently addressed the question of survival of a federal cause of action where the statute itself is silent. In *Smith v. No. 2 Galesburg Crown Finance Corp.,* 615 F.2d 407 (7th Cir. 1980), the court determined whether a cause under the Truth in Lending Act (hereinafter TILA) 15 U.S.C. §§ 1601 *et seq.* survived the death of the debtor plaintiff. The court in *Smith* concluded that even though Congress had created the TILA cause of action as a civil penalty the statute still had to be construed in terms of whether it was penal for purposes of survival. The general rule being that penalties do not survive the death of the plaintiff. *Schreiber v. Sharpless,* 110 U.S. 76, 3 S.Ct. 423, 28 L.Ed. 65 (1884). The court in *Smith*

concluded that the action was not penal and therefore survived. 615 F.2d at 414–415.

In *Smith* the court enunciated three factors to be considered in determining whether an action is penal for survival purposes: (1) whether the purpose of the action is to redress individual wrongs or wrongs to the public; (2) whether recovery runs to the individual or to the public; and (3) whether the authorized recovery is wholly disproportionate to the harm suffered. 615 F.2d at 414.

■ Section 1964(c) specifically provides that any injured person may sue to recover damages he sustained due to a violation of section 1962. The plain import of the section is to redress wrong suffered by the individual. Further, the recovery runs to that individual with the obvious purpose of making him whole. The multiple damage provision might give rise to the conclusion that the award is wholly disproportionate to the harm. However, the treble damages provided by the statute serve to liquidate uncertain actual damages and encourage the victim to bring suit to redress the violation.

Section 904(a) of Title IX also provided: The provisions of this title shall be liberally construed to effectuate its remedial purposes. 84 Stat. 947; 18 U.S.C. § 1961 n.

Congress has explicitly denominated RICO remedial, a determination which is "governed by ... statutory direction," *Helwig v. United States*, 188 U.S. 605, 613, 23 S.Ct. 427, 429, 47 L.Ed. 614 (1903); *Rex Trailer v. United States*, 350 U.S. 148, 150–54, 76 S.Ct. 219, 220–22, 100 L.Ed. 149 (1956). Specifically, sections 1964(a) and (b) were held to be remedial in *United States v. Cappetto, supra*, where the court stated "A civil proceeding ... is not rendered criminal in character by the fact that the acts are also punishable as crimes." 502 F.2d at 1357.

The text of Section 1964(c) provides that "(a) person injured in his ... property by reason of a violation of Section 1962 ... may sue ... and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee." Section 1962 is violated by "any person" associated with any enterprise ..., the activities of which affect ... commerce, conduct(ing) ... (the) enterprise's affairs through a pattern of racketeering activity ...." 18 U.S.C. § 1962(c). A mail fraud-arson scheme falls within RICO. *United States v. Starnes*, 664 F.2d 673, 677–78 (7th Cir. 1981); *United States v. Hansen*, 583 F.2d 325, 326–27 (7th Cir.), *cert. den.*, 439 U.S. 912, 99 S.Ct. 283, 58 L.Ed.2d 259 (1978); *City of Milwaukee v. Hansen*, Civil Action No. 77–C–246 (E.D.Wis.1981); (Recovery of treble damages by City for cost of fighting fire in *United States v. Hansen, supra*). The statute says shall recover, not may recover. The provisions of RICO have, moreover, been given, even in a criminal prosecution, a "liberal" construction to broaden, not narrow, their scope. *United States v. Lee Stroller Enterprises*, 652 F.2d 1313 (7th Cir. 1981) (en banc) ("enterprise" given broad construction); *United States v. McNary*, 620 F.2d 621, 628–29 (7th Cir. 1980) ("indirectly ... to invest" given broad construction). See generally, "RICO and the Liberal Construction Clause," 66 *Cornell Law Rev.* 167 (1980).

■ Section 1961(3) defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). This definition is an illustration, not a limitation. "Includes" is a term of enlargement, not of limitation.[5] Thus, the estate of an alleged wrongdoer is within the plain meaning of the statutory definition.

Examining the text of RICO leads to only one conclusion. Congress has provided that treble damages and attorney's fees shall be recovered; no other construction is consistent with plain meaning. *Flora v. United States*, 357 U.S. 63, 65, 78 S.Ct. 1079, 1081, 2 L.Ed.2d 1165 (1958) ("literal meaning of words employed").

---

5. Blakely, G. and Gettings B., *Racketeer Influenced and Corrupt Organizations (RICO): Basic Concepts—Criminal and Civil Remedies*, 53 Temple Law Quarterly 1009, 1022–1023 n. 78 (1980) (hereinafter Temple).

682

A construction of RICO that permits full survival against the estate of an alleged wrongdoer is "neither absurd nor surprising." See *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). It reflects a policy of compensating injured persons which would be thwarted by abatement. In fact, arson-for-profit, the subject of this litigation is one of the nation's fastest growing crimes. See "Arson and RICO", I. Materials on RICO, pp. 211–240. Nor is it fanciful to suggest that organized crime figures' assets may be held by nominees or corporate shells, although there is no such evidence in this case. However, a construction of RICO which would insulate the assets of organized crime from treble damage claims, for example, where a nominee was killed, would frustrate the purposes of the act. See *United States v. Parness*, 503 F.2d 430 (2d Cir. 1974), *cert. den.*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). To allow organized crime to profit by the fortuitous death of a principal defendant or alleged wrongdoer at the expense of the injured civil litigant would subvert the objectives of RICO, making its remedial and deterrent purposes impotent. In short, it would encourage the murder of the nominee or principal wrongdoer if the criminal organization were allowed to preserve its ill-gotten gains and avert the disgorgement contemplated by RICO.

■ The stated purpose of RICO was to "provide enhanced sanctions and new remedies to deal with the unlawful activities of those engaged in organized crime." P.L. 91–452 section 1, 18 U.S.C. § 1961 n. The unique nature of the federal remedy and its breadth create an overriding interest in uniformity which requires application of federal law to the question of survival. On the basis of this analysis, the Court must conclude that an action brought pursuant to section 18 U.S.C. § 1964(c) is remedial in nature and survives the death of the alleged wrongdoer and treble damages are recoverable from his estate.

III.

The next issue which must be decided is the effect of the abatement of the underlying criminal conviction upon the plaintiff's ability to assert that prior judgment as offensive collateral estoppel.

Defendant argued to the Court both in his brief and oral argument that since the language of 18 U.S.C. § 1964(d) made estoppel between a prior criminal judgment and a subsequent civil suit applicable to an action "brought by the United States," it should be read to preclude the application of the doctrine of issue preclusion between a prior criminal judgment and a subsequent private civil action. Plaintiff, of course, takes the opposite position.

Section 1964(d) provides:

A final judgment or decree rendered in favor of the United States in any criminal proceeding brought by the United States under this chapter shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding brought by the United States.

Obviously, the statute authorizes the use of estoppel by the government; it says nothing about denying the use of issue preclusion theory to a private party. Defendant would have this Court draw the sort of "negative inference" in construing RICO that the Supreme Court rejected in *Turkette, supra*, 101 S.Ct. at 2532. (appropos of enterprise).

Plaintiff does not seek to rely on Section 1964(d). It is relying on the general principles of issue preclusion set forth in the Supreme Court's decision in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). There is nothing on the face of RICO that says that these principles are not applicable. Indeed, since the statute was enacted in 1970, and the Supreme Court's decision in *Parklane* was not handed down until 1979, it would be a strange result to hold that RICO says or was intended to have such an effect. All of the policy considerations well articulated by the Supreme Court in *Parklane* are here applicable. If Congress wishes to carve out a special area where another rule will apply, it is up to Congress to do so explicitly.

Defendant Caton secured an abatement of his criminal prosecution on the grounds of death. Defendant contends that the abatement of the criminal conviction wipes out the Court's judgment for issue preclusion purposes in the context of this civil litigation. Plaintiff does not quarrel with defendant's right to follow this course of action. Nor does plaintiff suggest that there is now in legal existence a criminal judgment on which it can premise issue preclusion on the question of civil liability for the defendant for his course of conduct amounting to arson, fraud and racketeering. The plaintiff's contention, however, is that the general doctrine of equitable estoppel ought to bar the defendant from asserting the abatement of the criminal prosecution, for if the defendant is permitted to bring into evidence the fact of the abatement, he will secure, to the defendant's disadvantage and contrary to sound principles of judicial economy, two trials on the same issue. Having foregone the opportunity to review the propriety of his conviction, he should not be permitted to treat the slate as if it were clean and as if he had never been found guilty by a jury of his peers. Plaintiff candidly concedes that it has found no case directly in point in support of its contention. Instead, it argues from general principles of equity and the sound administration of justice.

The law of abatement of criminal prosecutions developed without consideration of the civil consequences of criminal convictions. Defendant has now attempted to secure a civil advantage by abating his criminal prosecution. The law of issue preclusion, as articulated by the Supreme Court in *Parklane Hosiery v. Shore, supra,*[6] is designed to assure the fair and efficient use of judicial resources. Each person is entitled to a day in court but should not be entitled to two.

The policy considerations enunciated in *Parklane* are certainly applicable in a RICO civil action. This Court is well aware of the need for judicial economy both here and the dockets of courts across the country. Further, equity and this Court's sense of fair play are averse to any litigant getting more than one bit of the trial apple. However, the simple fact is irrefutable; no underlying previous decision now exists on which to apply the *Parklane* criteria. Abatement *ab initio* in a criminal setting wipes the slate clean.

■ Accordingly, the Court must conclude that offensive collateral estoppel cannot be applied to bar the relitigation in this civil context of a violation of section 1962 under section 1964(c). This conclusion allows a defendant the advantageous use of abatement while denying a plaintiff the use of collateral estoppel. The only solace to the plaintiff is the vast amount of sworn testimony available in a subsequent action should the opportunity for its use present itself under the rules of evidence. However, upon appropriate motion collateral estoppel may be available against defendants James Caton and Cheryl Melton.

## IV.

The final issue which must be addressed is what statute of limitations applies to this action and what results from that application.

■ RICO does not contain a statute of limitation provision. When a federal statute creates a federal cause of action but specifies no particular statute of limitations, the federal courts usually apply the nearest analogous state statute of limitations. *Johnson v. Railway Express Agency,* 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975); *International U., U.A., A. & A.I.W. v. Hoosier Cardinal Corp.,* 383

**6.** The court in *Parklane* outlined four factors for consideration before applying offensive collateral estoppel: (1) the party seeking to use collateral estoppel could not have joined the previous action; (2) the party against whom collateral estoppel would apply had incentive to fully litigate the issue in the prior action; (3)

there would have been no inconsistent rulings on the issues in prior actions; and (4) there are no new opportunities available to the precluded party or if there are, they are not likely to cause a different result. 439 U.S. at 331–332, 99 S.Ct. at 651–652.

U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); *Chattanooga Foundry and Pipe Works v. City of Atlanta*, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (1906).

The better approach would seem to be to apply the nearest analogous federal statute because it would promote predictability and uniformity. Such application would also avoid encumbering the remedial purposes of RICO with an unworkable body of law on the question of which state statute of limitation to apply. In *Occidental Life v. E.E. O.C.*, 432 U.S. 355, 97 S.Ct. 2447, 53 L.Ed.2d 402 (1977), the Supreme Court of the United States held that state statute of limitation periods would not be borrowed if their application would be inconsistent with the underlying policies of the federal statute. *Id.* at 367, 97 S.Ct. at 2454. Justice Stewart opined for the court that Congress did not foresee the enormous backlog of suits which would confront the E.E.O.C. and that application of a state statute of limitations would frequently bar plaintiff's suit. *Id.*, at 370–71, 97 S.Ct. at 2456–57. Stewart concluded that this result was contrary to congressional intent and affirmed the lower court in holding that the state statute of limitations was not applicable.

It is difficult to weigh what effect *Occidental* has on RICO cases. The House of Representatives had opportunities to include or add a statute of limitations to RICO. 91st Cong., 2d Sess. (1970) (proposed statute of limitations in H.19215); 116 Cong.Rec. 35346 (1970) (floor amendment of Representative Stieger). Also Senators McClellan and Hruska's senate bill S.16 would have amended RICO to provide a statute of limitations. However, the House did not consider it. 92d Cong.2d Sess. 3–4 (1972); 118 Cong.Rec. 29615 (1972) (no action was taken on H.R. 8389 after referral to committee). Since RICO was patterned after antitrust law and Congress was ostensibly aware of the prior antitrust practice

of looking to the state law and the subsequent enactment of the federal statute of limitations, one can only conclude that Congress intended the courts to apply the state law. Therefore, *Occidental* appears to stand for the proposition that borrowing of state limitation periods to determine the timeliness of claims is conditioned on the state limitation period being consistent with the policies underlying the federal rights of action. *Beard v. Robinson*, 563 F.2d 331 (7th Cir. 1977).

■ In this cause the selection of which state law is not at issue. The plaintiff is a corporation doing business in Indiana and the res of the defendant estate is located in Indiana. The contract of insurance was consummated in Indiana. Finally, the insured property and the related alleged fraudulent acts occurred in Indiana. Thus, all the operative facts occurred in Indiana and there is no issue as to choice of law. However, it is foreseeable that a complex issue concerning a choice of state law will arise where the operative facts occurred in a state other than the forum state or a combination of states.[7]

■ Given the conclusion that Indiana provides the applicable body of law, the question becomes which state statute of limitations should be invoked. Federal courts are empowered to determine which of several state statutes to apply, for the characterization of a federal cause of action for purpose of selecting the appropriate statute of limitations is ultimately a question of federal law. *Hoosier Cardinal Corp.*, 383 U.S. 696, at 706, 86 S.Ct. 1107, at 1113, 16 L.Ed.2d 192 (1966); *LaRosa Bldg. v. Equitable Life Assur. Soc. of U. S.*, 542 F.2d 990 (7th Cir. 1976). In making this selection courts should consider the objectives of the substantive federal statute and apply the period of limitations that best effectuates its policy. *LaRosa, supra,* at 992.

---

7. See, *Hoosier Cardinal Corp., supra.* The record indicates that Indiana is both the forum State and the State in which all operative events occurred. Neither party has suggested that the limitations provision of another State is relevant. There is therefore no occasion to consider whether such a choice of law should be made in accord with the principles of *Klaxon Co. v. Stenton Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; or by operation of a different federal conflict-of-laws rule. 383 U.S. at 705, n. 8, 86 S.Ct. at 1113 n. 8 (1966).

Defendant contends that the two year Indiana statute for statutory penalties should apply.[8] The argument being that RICO specifically includes only mail fraud, wire fraud, and bankruptcy fraud but not general fraud on insurance companies. Further, the cause of action provided by RICO is more analogous to a claim for the forfeiture of a penalty. Defendant relies on *Sandidge v. Rogers*, 167 F.Supp. 553 (S.D.Ind.1958), which held that a civil action under the Clayton Act for treble damages was penal in nature and therefore within the two year statute of limitations. The other statute of limitations under consideration is the six year period for relief against frauds.[9]

The underlying claim in this cause is that the defendants victimized the plaintiff by setting fire to property which the plaintiff insured for the purpose of collecting the insurance proceeds. This cause sounds in the common law tort of fraud. *Ballard v. Drake's Estate*, 103 Ind.App. 143, 5 N.E.2d 671 (1937), which dealt with this statute in a constructive trust context held "that [the six year fraud statute] applies to actions the immediate and primary object of which is to obtain relief from fraud, and not to actions which fall within some other class, even though questions of fraud may arise incidentally." *Id.*, 5 N.E.2d at 675, citing *Wilson v. Brookshire*, 126 Ind. 497, 25 N.E. 131, 133 (1890). The court in *Ballard* found that the "sole objective of the instant case was to obtain relief from fraud already perpetrated" and therefore applied the six year statute of limitations. Similarly, the case at bar is to recover the proceeds of an allegedly fraudulent insurance claim.

■ This Court has already herein determined that this action is remedial in nature, not penal. Further, the apparent purpose of the treble damage award is to provide liquidated damages and encourage victims to bring suit to redress any violation. This action is surely one seeking to obtain relief from an alleged fraud already perpetrated. Also, the application of a two year statute of limitations would bar many prospective claims because by its very nature a civil RICO action may not be brought to light until after a criminal investigation. In light of all the foregoing, this Court shall apply the six year statute of limitations for fraud, which is the underlying substantive claim; as said statute best effectuates the purposes of the act.

The fire in question here occurred on or about March 14, 1976 at 306 E. Fox Street in South Bend, Indiana. This cause was filed on June 5, 1981. Thus, simple arithmetic indicates that the fire in question occurred and the cause was brought within the six year period. The Court need not address the question of fraudulent concealment of a cause of action and the choice of law involved there because the cause of action was brought within the limitation period. See, *Morgan v. Koch*, 419 F.2d 993, 996–998 (7th Cir. 1969); *Forth v. Forth*, Ind.App., 409 N.E.2d 641 (1980).

Therefore, pending motions to dismiss and for summary judgment are DENIED. This cause shall go forward to trial in conformity with this memorandum and order. Final pretrial conference is now set for July 16, 1982 at 11:30 o'clock A.M. at the United States Court House in South Bend, Indiana.

SO ORDERED.

---

8. I.C. 34–1–2–2 First. For injuries to person or character, for injuries to personal property and for forfeiture of penalty given by statute [shall be commenced] within two (2) years.

9. The following actions shall be commenced within six years after the cause of action has accrued, ... Fourth. For relief against frauds. I.C. 34–1–2–1