Phyllis **FAIRCLOTH**, Administratrix of the Estate of Jiles T. Lynch, Plaintiff,

v.

**JACKIE FINE ARTS, INC.**, Herman Finesod, Marilyn Goldberg, Marigold Enterprises, Ltd., Sigmund Rothschild, and F. Peter Rose, Defendants.

Civ. A. No. 2:85–1854–1.

United States District Court, D. South Carolina, Charleston Division.

March 30, 1988.

On Pro Se Motion for Summary Judgment April 6, 1988.

Arnold S. Goodstein, Ann M. Priest, Summerville, S.C., John P. Freeman, Columbia, S.C., for plaintiff.

Susan Taylor Wall, W. Jefferson Leath, Charleston, S.C., for Jackie Fine Arts, Inc., and Finesod.

F. Peter Rose, pro se.

Sigmund Rothschild, pro se.

## ORDER

HAWKINS, District Judge.

This action is before the court on the report and recommendation of the United States Magistrate made in accordance with Title 28, United States Code Section 636(b)(1)(B). The court is charged with making a *de novo* determination of any portion of the Magistrate's recommendation to which specific objection is made, and it may accept, reject, or modify, in whole or in part, the recommendation made by the Magistrate, or recommit the matter to the Magistrate with instructions.

The plaintiff, Phyllis Faircloth, is the administratrix of the estate of Jiles T. Lynch (Lynch). In December 1979, Lynch purchased an art master for Picasso's *Portrait Au Cou Bleu* from Jackie Fine Arts, Inc. (Jackie). As consideration for the art master purchase, Lynch paid Jackie $40,000 cash and executed three notes: a $40,000 note due February 1, 1980; a $20,000 note due February 1, 1981; and a $450,000 note due June 1, 1994, $250,000 of which was non-recourse. Thus, the total purchase price of the art master was $550,000. Lynch executed all three notes on December 14, 1979, and he contemporaneously executed an assignment of net receipts whereby he assigned Jackie fifty percent of all net receipts arising from the exploitation of the art master. These sums contributed to the payment of the $450,000 note.

An art master is a reproduction plate. As a result of the execution on December 14, 1979 of the purchase and security agreement and accompanying documents, Lynch received, *inter alia,* the master, all copyrights related to the master and additional rights as defined by the purchase and security agreement.

The parties do not dispute that the purchase of the art master was motivated less by profit-making concerns and more by the tax shelter nature of the investment. As part of his purchase, Lynch received a free defense to a challenge of the Jackie "approach" by the Internal Revenue Service or any taxing authority. In addition, Jackie promised Lynch two independent appraisals of the art master, and these appraisals were rendered by defendants Sigmund Rothschild and F. Peter Rose. Since a large portion of the purchase price of the art master was paid in the form of a non-recourse note, these appraisals were undoubtedly intended to refute any Internal Revenue Service challenge to the valuation of the art master.[1]

Plaintiff filed this suit seeking damages and equitable recision of the purchase and security agreement. She alleges that the transaction between Lynch and Jackie involved the unlawful sale of a security, unfair trade practices, fraud, constructive fraud, breach of fiduciary duties, civil conspiracy and violations of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–1968 (1984 and Supp.1987).

Defendants Jackie, Herman Finesod, Marilyn Goldberg, and Marigold Enterprises, Ltd. seek summary judgment on all of the plaintiff's causes of action. Jackie also seeks summary judgment on its counterclaim to recover sums allegedly owed pursuant to the $450,000 note. After considering the voluminous briefs submitted by the parties and conducting a hearing on the matter, the Magistrate recommended that all counts of the complaint be dismissed with prejudice with the exception of the RICO count. The Magistrate recommends that the RICO cause of action be dismissed without prejudice. The plaintiff has filed extensive objections to the Magistrate's report, and the movants have also filed objections.

The issue in determining a motion for summary judgment is whether there exists

---

1. Rothchild and Rose appraised Lynch's art master for $700,000 and $750,000 respectively.

The parties dispute whether these two appraisers were independent from Jackie or each other.

a genuine issue of material fact. Fed.R. Civ.P. 56.

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Though this initial responsibility rests with the moving party, when a motion for summary judgment is made and supported as provided in Rule 56, the non-moving party must produce "specific facts showing that there is a genuine issue for trial," rather than resting upon the bald assertion of his pleadings. Fed.R.Civ.P. 56(e); *see Celotex,* 477 U.S. 317, 106 S.Ct. 2548.

Thus,

> the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex* at 322–323, 106 S.Ct. at 2552–53.

### I. Does the court have personal jurisdiction over defendants Marigold Enterprises, Ltd. and Marilyn Goldberg?

Before reaching the merits of the summary judgment motions, the court must first address the contention of Marigold Enterprises, Ltd. (Marigold) and Marilyn Goldberg (Goldberg) that the court lacks jurisdiction over them. These defendants claim that the September 30, 1981 agreement between Marigold and Lynch provided for arbitration of any disputes arising under the agreement. Second, they claim that the September 1981 agreement and the February 1984 agreement both provided that the contracts were to be performed by Marigold wholly within the state of New York, and that this court, therefore, lacks jurisdiction over these defendants.

### A. Are defendants Marigold and Goldberg entitled to arbitration?

In response to defendants' claim of a right to arbitration, the plaintiff contends that her claims arise out of conduct which occurred before the parties entered into the September 1981 agreement, and that the 1981 agreement lasted only two years and that the subsequent 1984 agreement contained no arbitration clause. Plaintiff also argues that any right to arbitration has been waived by these defendants' lack of diligence in asserting their supposed right.

Federal law controls the determination of the arbitrability of a suit if the contract containing the arbitration clause involves interstate commerce. *Maxum Foundations, Inc. v. Salus Corp.,* 779 F.2d 974, 978 (4th Cir.1985). Plaintiff initially contends that the motion must fail because RICO claims are not arbitrable.

Subsequent to the filing of plaintiff's reply, the United States Supreme Court decided *Shearson/American Express, Inc. v. McMahon,* — U.S. —, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). In that case, the court held that RICO claims were arbitrable when the agreement which underlies the parties' relationship so provides. *Id.* at 2345. The arbitration clause in that case provided generally for the arbitration of disputes arising between the parties under the agreement, so it appears that the clause need not specifically direct arbitration of RICO claims. Thus, the plaintiff's argument that RICO claims are not arbitrable must fail.

■ Plaintiff next contends that the cause of action against these defendants does not arise solely out of the agreement which contained the arbitration clause. Indeed the plaintiff points out that the September 1981 agreement was entered almost two years after the initial art master purchase. Plaintiff alleges participation by Goldberg in the promotion of the art master which occurred prior to the purchase, and fraudulent conduct by Goldberg and Marigold after the expiration of the September 1981 agreement. Thus, plaintiff is correct that the cause of action does not arise solely from the September 1981 agreement, and the entire dispute is not, therefore, subject to arbitration.

Plaintiff next alleges that Marigold and Goldberg have waived their right to arbitration of any part of the cause of action by their lack of diligence in seeking arbitration. Specifically, plaintiff claims that she will be severely prejudiced by the court's dismissal of any aspect of this suit in favor of arbitration because of the expense incurred and time spent in the litigation prior to the filing of defendants' motion.

The Fourth Circuit Court of Appeals discussed waiver of the contractual right to arbitration in the *Maxum Foundations* case in the context of a default of the right to seek a stay pursuant to 9 U.S.C. § 3 (1982). The court stated, "A litigant may waive its right to invoke the Federal Arbitration Act by so substantially utilizing the litigation machinery that to subsequently permit arbitration would prejudice the party opposing the stay." *Maxum Foundations* at 981. In that case, the court held that the right to arbitration had not been waived by the defendants having waited three months after the filing of the complaint to seek the stay.

■ In the case at bar, the litigation had proceeded for eighteen months before these defendants sought to enforce their right to arbitration, and the right extends to only a part of the claim. The parties have conducted numerous depositions and spent undoubtedly enormous amounts of time in the preparation of motions and responses. The case will be three years old

in July of this year. It appears to the court that too much time and effort will have been wasted and the litigation will become unnecessarily protracted if the court decides to send part of the claim to an arbitrator. Thus, the court concludes that the defendants Goldberg and Marigold have waived their right to arbitration of the claims to whatever extent they possessed the right in this case.

### B. Does this court have jurisdiction over the defendants Marigold and Goldberg?

■ "Before a federal court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied." *Omni Capital International v. Rudolf Wolff & Co., Ltd.,* — U.S. —, —, 108 S.Ct. 404, 409, 98 L.Ed.2d 415 (1987). Fed.R.Civ.P. 4(e) provides in pertinent part:

Whenever a statute of the United States or an order of court thereunder provides for service of summons … upon a party not an inhabitant of or found within the state in which the district court is held, service may be made under the circumstances and in the manner prescribed by the statute or order…. Whenever a statute or rule of court of the state in which the district court is held provides (1) for service of a summons … upon a party not an inhabitant of or not found within the state … service may … be made under the circumstances and in the manner prescribed in the statute or rule.

Thus, this court may exercise jurisdiction over the defendants Goldberg and Marigold if the service complied with either a federal or state statute authorizing service on nonresident defendants.

The RICO statute provides for national service of process in civil RICO cases when required by the ends of justice. 18 U.S.C. § 1965(b) (1984). The "ends of justice" requirement has been interpreted as limiting the instances of national service of process to those cases in which 1) the court has jurisdiction over at least one of the parties pursuant to 18 U.S.C. § 1965(a) and 2) the

plaintiff cannot otherwise obtain personal jurisdiction over all alleged co-conspirators in one forum. *Butcher's Union Local No. 498, United Food and Commercial Workers v. SDC Investment, Inc.,* 788 F.2d 535 (9th Cir.1986).

In the case at bar, all defendants were doing business in the state of New York. Thus, the plaintiff could have obtained personal jurisdiction over these defendants in New York. Therefore, under the Ninth Circuit rule, nationwide service of process is not available in this case. The court declines, however, to decide whether to adopt the Ninth Circuit rule because it concludes that these defendants were properly served under the South Carolina long-arm statute, S.C.CODE ANN. § 36-2-803 (Law Co-op. 1976).

South Carolina has interpreted its long-arm statute to extend the state's jurisdiction to the due process limits, *Atlantic Soft Drink Co. of Columbia, Inc. v. South Carolina National Bank,* 287 S.C. 228, 231, 336 S.E.2d 876, 878 (1985). Therefore, this court is limited in its jurisdictional scope only by those due process parameters.

The due process clause of the Constitution forbids the exercise of personal jurisdiction over a non-resident defendant when the exercise of such jurisdiction violates traditional notions of substantial justice and fair play. *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The court cannot, therefore, exercise personal jurisdiction over a defendant who has not established certain minimum contacts with the forum state. *Burger King* at 2183.

In the case at bar, the plaintiff asserts that Goldberg sent several letters and promotional brochures to Lynch in South Carolina before entering the September 1981 agreement. She actively sought to enter into the distribution and licensing agreements with Lynch. The Court stated in *Burger King:*

> [W]here the defendant "deliberately" has engaged in significant activities within a state, or has created "continuing obli-

gations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King* at 2184 (citations omitted). Goldberg and Marigold have created just such a continuing obligation with Lynch, and the creation of the relationship did not result from the unilateral conduct of Lynch.

The fact that Goldberg never entered the state of South Carolina is not controlling. The Supreme Court stated:

> Although territorial presence frequently will enhance a potential defendant's affiliation with a state and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail or wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected that an absence of physical contacts can defeat personal jurisdiction there.

*Id.*

Goldberg and Marigold, through Goldberg, actively sought to do business with Lynch and solicited his business in South Carolina. They cannot now claim that the exercise of jurisdiction by this court offends traditional notions of substantial justice and fair play. For these reasons, the court concludes that jurisdiction is proper over these two defendants. Therefore, the court now turns to the merits of the plaintiff's case.

## II. Was the sale of the art master a sale of a security?

The Magistrate recommended the dismissal of Counts I and IV of the complaint because he concluded that the art master

was not a security for purposes of state or federal security law. The gist of plaintiff's objections 3, 5, and 7–15, is that this finding by the Magistrate was erroneous.

Plaintiff specifically alleges that the sale of the art master violated Section 17 of the Securities Act of 1933, 15 U.S.C. § 77q (1981), Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 and Rule 10b–5 thereunder, 15 U.S.C. §§ 78j(b) and 78t(a) (1981) and 17 C.F.R. § 240.10b–5 (1987). In addition, plaintiff claims that the sale violated comparable state laws, including S.C.CODE ANN. §§ 35–1–990, –1210, –1490, and –1500 (Law Co-op. 1976). The threshold question which this court must decide is whether or not the sale of the art master and accompanying rights involved the sale of a security.

### A. Is there a difference between a South Carolina "security" and a federal "security"?

Plaintiff's objection # 8 specifically disputes the finding by the Magistrate that the art master investment was not a security for purposes of the South Carolina securities laws. The question presented by this objection is whether the art master could be a security under South Carolina law and not a security under federal law.

Plaintiff alleges more specifically that the art master sale was the sale of an interest in a profit-sharing agreement or of an investment contract. These two types of investments are included in the definition of a security under state and federal law. S.C.CODE ANN. § 35–1–20(12) (Law Co-op. 1976) and 15 U.S.C. § 77b(1) (Supp. 1987).[2] Indeed, the definitions of "security" contained in these two statutes are virtually identical.

South Carolina courts have had at least two occasions to determine if a certain investment was a security under South Carolina law. In *McGaha v. Mosley*, 283 S.C. 268, 322 S.E.2d 461 (S.C.App.1984), the court was faced with its first opportunity to construe the meaning of the South Car-

olina definition of "security." In holding that an interest in the profits under a franchise agreement was a security under South Carolina law, the court stated:

> [T]he definition of "security" in Section 35–1–20(12) is taken almost verbatim from Section 2 of the federal Securities Act of 1933, 15 U.S.C. § 77b. In construing the South Carolina Uniform Securities Act, our courts look for guidance to those cases interpreting the federal statute.

*Id.* at 273, 322 S.E.2d at 464. Thus, while the court did not explicitly state that the two statutes were identical, it certainly indicated that the statutes were parallel.

This conclusion was reaffirmed in *Garrett v. Snedigar*, 293 S.C. 176, 359 S.E.2d 283 (S.C.App.1987), in which the court held that certain partnership interests were not securities under South Carolina law. The court echoed the feeling of the *McGaha* court in stating that the court may look to cases construing the federal statute for guidance in construing the state statute. *Garrett* at 180, 359 S.E.2d at 285. Furthermore, the court in *Garrett* applied this principle in determining the meaning of the term "investment contract" as used in the state statute. Exactly such a determination is necessary in the case at bar.

Thus, it appears from these cases that South Carolina courts have yet to perceive any significant difference between the federal and state definitions of "security." In addition, the consistent interpretation of the state and federal statutes enhances the operation of the securities market. Such interpretation alleviates the expensive inquiry into the specific contours of each state's definition of the term "security." For these reasons, the court concludes that the art master project was either a security under state and federal law or not at all.

### B. Was the art master an interest in a profit-sharing agreement or an investment contract?

■ A security may consist of a certificate of interest or participation in any prof-

**2.** Both the Securities Act of 1933 and the Securities Exchange Act of 1934 contain a definition of "security." As would the Supreme Court, this court treats the definitions as covering the same investments, and the court's analysis of this term applies to both Acts. *See Marine Bank v. Weaver*, 455 U.S. 551, 556 n. 3, 102 S.Ct. 1220, 1223 n. 3 (1982).

it-sharing agreement or an investment contract. 15 U.S.C. § 77b(1) (Supp.1987) and S.C.CODE ANN. § 35–1–20(12) (Law Co-op. 1976). Plaintiff asserts that the art master was either a profit-sharing agreement, an investment contract or both.

The United States Supreme Court established the parameters for recognizing an investment contract in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed.2d 1244 (1946). "[A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party...." *Id.* at 299, 66 S.Ct. at 1103.

In *Howey*, the Court addressed a scheme in which investors were sold a row or rows of citrus fruit trees and were offered contemporaneously a service contract which provided for the cultivation of the trees. Under the above definition of an investment contract, the Court had no problem finding that each sale of trees constituted the sale of a security. The fact that some of the investors in *Howey* declined to accept the service agreements did not affect the Court's conclusion, and the Court noted, "The Securities Act prohibits the offer as well as the sale of unregistered, non-exempt securities." *Id.* at 301, 66 S.Ct. 1104.

The Fourth Circuit had a recent opportunity to construe the *Howey* test in *Rivanna Trawlers Unlimited v. Borchardt*, 840 F.2d 236 (4th Cir.1988). In that case, retired Supreme Court Justice Powell sat by designation and wrote the court's opinion. The question presented to the court by the facts of that case was whether the sale of a general partnership interest constituted the sale of a security under the *Howey* test. The court applied the third prong of the *Howey* test—expectation of profits solely from the efforts of others—in concluding that the general partnership interests were not securities.

In reaching this conclusion, the court found significant several factors which are also present in the case at bar. First, the court notes, "The critical inquiry is, 'whether the powers possessed ... were so significant that, regardless of the degree to which such powers were exercised, the investments could not have been premised on a reasonable expectation of profits to be derived from the management efforts of others.'" (Citation omitted). *Rivanna Trawlers* at 241.

In answering this inquiry, the court declined to look at the business expertise of each individual partner, *id.* at 241, n. 7, and recognized that the decision of some of the general partners to remain passive did not make their investment a security. Finally, the court distinguished *Howey* on the grounds that the general partners in *Rivanna Trawlers* all had a realistic opportunity to manage, control and supervise the operation of the partnership through the exercise of substantial partnership powers.

The conclusion reached by the Fourth Circuit tends to exalt form over substance, but this court is nonetheless bound by the precedent established in that case. Most significantly, the Fourth Circuit precluded inquiry into the expertise of the investor and into the extent to which an investor with managerial powers chose to remain passive. There is no question that Lynch could have marketed the art master himself, and the fact that he chose not to do so cannot, according to the Fourth Circuit, render this investment a security. As stated in *Rivanna Trawlers*, an investor "cannot convert [his investments] into a security merely by remaining passive." *Rivanna Trawlers* at 242, n. 10.

The *Rivanna Trawlers* case forces the court to consider the character of the investment rather than the character of the investor. This practice will avoid the somewhat absurd result that the determination of whether a promoter is selling a security turns on the identity of the persons to whom he sells.

Finally, the court turns to the facts of the *Howey* case. In that case, the investors purchased rows of citrus fruit trees, and over eighty percent of the investors accepted service contracts which were offered to them contemporaneously with the offer of the sale of real estate. The key

difference between that case and this case is the extent to which the individual investments were intertwined. In that case, the Court noted that the tracts of citrus fruit trees "gain utility as citrus groves only when cultivated and developed as component parts of a larger area." *Howey* at 300, 66 S.Ct. at 1103. This interdependence among investments is lacking in the case of the art masters, and it is this fact which distinguishes the case at bar from *Howey*.

The securities laws were designed "to compel full and fair disclosure relative to the issuance of 'the many types of instruments that in our commercial world fall within the ordinary concept of a security.' H.Rep. No. 85, 73rd Cong., 1st Sess., p. 11." *Howey* at 299, 66 S.Ct. at 1103. Furthermore, the term "investment contract" "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of money of others on the promise of profits." *Id.*

However, the securities laws were not intended to provide a federal remedy for every common law fraud. *Rivanna Trawlers* at 242. The court concludes that this case falls outside federal and state securities laws, and summary judgment on Counts I and IV of the complaint will, therefore, be granted.[3]

### III. Does a claim brought under the South Carolina Unfair Trade Practices Act survive the death of the injured party?

■ In the second count of her complaint, the plaintiff claims that the defendants are guilty of unfair and deceptive trade practices in violation of the South Carolina Unfair Trade Practices Act, S.C. CODE ANN. §§ 39–5–10 to 39–5–160 (Law Co-op. 1976 and Supp.1987) (herein "SCUT-

PA"). The defendants seek summary judgment alleging that a SCUTPA cause of action does not survive the death of the plaintiff. The parties do not dispute that this motion presents a question not yet decided by the courts of South Carolina.

The statute itself seems to provide the answer to the survivability question. The statute provides:

> Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39–5–20 may bring an action individually, *but not in a representative capacity,* to recover actual damages.

S.C.CODE ANN. § 39–5–140 (Law Co-op. 1976) (emphasis added).

Thus, the language of the statute precludes the bringing of a SCUTPA action by a plaintiff who acts in a representative capacity. Plaintiff suggests that this language was intended to preclude class actions under the SCUTPA, but cites no case to support this conclusion. Furthermore, the interpretation proffered by plaintiff is not consistent with the plain language of the statute.

For the above reasons, the court concludes that the statute precludes plaintiff from maintaining a SCUTPA action in her capacity as representative of Lynch's estate.[4] Plaintiff argues, however, that, to the extent that it precludes the survival of a SCUTPA claim, the survival statute is unconstitutional. Inasmuch as the court finds that the SCUTPA cause of action does not survive because of the express language of that statute, the court will not address the constitutionality of the survival statute at this time. Summary judgment

---

**3.** Because the court concludes that the investment was not made with the expectation of profits solely from the efforts of others, it need not address whether the vertical or horizontal commonality tests which spring from the second prong of the *Howey* test are met in this case.

**4.** The plaintiff asserts that the estate has a SCUTPA claim independent of Lynch's claim

because the defendants have perpetrated wrongs against the estate since Lynch's death. This assertion is not supported by the complaint which alleges only a conspiracy which "continues at this hour," but is completely devoid of allegations of specific wrongs perpetrated against the estate. This case centers around the offer and sale of the art master, both of which occurred long before Lynch's death.

846

will, therefore, be granted on Count II of the complaint.

## IV. Does a claim for fraud and deceit survive the death of the injured party?

The parties do not dispute that, under the South Carolina Survival Statute, S.C. CODE ANN. § 15-5-90 (Law Co-op. 1976), a cause of action at law for damages based on fraud and deceit does not survive the death of the injured party. *See Mattison v. Palmetto State Life Ins. Co.*, 197 S.C. 256, 15 S.E.2d 117 (1941). Plaintiff asserts and defendants assume that an equitable cause of action for fraud and deceit which seeks recision of a contract does survive, and such appears to be the law in this state. *Page v. Lewis*, 203 S.C. 190, 26 S.E.2d 569 (1943), and *see Hughey v. Mooney*, 282 S.C. 597, 320 S.E.2d 475 (S.C.App. 1984). Defendants allege, however, that summary judgment is nonetheless proper on the fraud recision claim because the plaintiff cannot provide evidence of several of the elements of fraud. Furthermore, if the court concludes that the plaintiff's claim can survive the motion for summary judgment on the merits of the fraud claim, then it must address plaintiff's claim that the survival statute, as applied, is unconstitutional.

### A. Is summary judgment proper on the merits of the fraud claim?

■ Defendants Goldberg and Marigold claim that summary judgment is proper on the fraud claim because neither of them made any statements to Lynch to induce his purchase of the art master. Defendants Jackie and Finesod claim that they are entitled to summary judgment because (1) Jackie made no false representations of fact, (2) the plaintiff cannot establish actual reliance on any alleged misrepresentation, and (3) plaintiff cannot establish that Lynch had a right to rely on Jackie's representations.

It is well established in South Carolina, in order to recover for fraud a plaintiff must establish the following nine elements: (1) a representation; (2) its falsity; (3) its materiality; (4) either knowledge of the falsity or reckless disregard of its truth or falsity; (5) intent that the representation be acted upon; (6) the hearer's ignorance of its falsity; (7) the hearer's reliance on its truth; (8) the hearer's right to rely thereon; (9) the hearer's consequent and proximate injury. *O'Shields v. Southern Fountain Mobile Homes, Inc.*, 262 S.C. 276, 204 S.E. 2d 50 (1974).

#### 1. The Jackie/Finesod motion

The representation which must be proved must be a representation of fact and not opinion. *Gilbert v. Mid–South Machinery Co., Inc.*, 267 S.C. 211, 227 S.E.2d 189 (1976). Jackie and Finesod allege that the statements which plaintiff claims are fraudulent are statements of opinion or statements as to future events and, as such, are not actionable.

The plaintiff alleges Jackie represented that independent appraisers would appraise the art master investments. This representation was made to potential investors, including Lynch, at a promotional meeting at the Colony House Restaurant in Charleston, South Carolina, in November of 1979, just one month prior to the Lynch purchase.

The importance of this representation is patent. The art masters were marketed as tax shelters which are strictly scrutinized by the Internal Revenue Service. Part of the consideration for the purchase was a note, a large portion of which was non-recourse. In establishing the basis of an investment for depreciation purposes and the validity of the loss deductions which flow from this depreciation expense, accurate appraisals of the investment are vital when the purchase price is substantially paid by a non-recourse note. Furthermore, the representation that Rothschild and Rose were independent appraisers was not a statement of opinion, but was a statement of fact. Because of the importance of the valuation in the tax shelter venue, the question of reliance on the statement should be left to the jury.

Finally, Jackie alleges that the plaintiff cannot establish that Lynch had a right to rely on the statement. A purchaser has a

right to rely on statements made by a seller which are peculiarly within the knowledge of the seller. *See Reid v. Harbison Development Corp.*, 295 S.C. 557, 330 S.E.2d 532 (S.C.App.1985). Jackie's local marketing agents testified at deposition that the fact that Rose and Rothschild were not independent from Jackie was not even within their knowledge. Certainly, this information could not have been within Lynch's knowledge. For the above reasons, the court concludes that summary judgment on the merits of the fraud claim against Jackie and Finesod is not proper.[5]

### 2. The Marigold/Goldberg motion

■ Although plaintiff alleges in response to the Marigold/Goldberg motion that these defendants made fraudulent statements to Lynch and to the representative of his estate after the art master purchase, she directs the court to evidence of not one alleged fraudulent statement. Thus, it appears that since fraud must be pled with particularity, Fed.R.Civ.P. 9(b), and the plaintiffs have not particularly pled fraudulent statements made by these defendants, the decision on this aspect of the case turns on the viability of plaintiff's civil conspiracy allegation.

A cause of action for civil conspiracy exists in South Carolina. *Island Car Wash, Inc. v. Norris*, 292 S.C. 595, 358 S.E.2d 150 (S.C.App.1987). The elements of a civil conspiracy are: (1) a combination of two or more persons, (2) for the purpose of injuring the plaintiff, (3) and which causes the plaintiff special damage. *Id.* at 600, 358 S.E.2d at 152. In order to establish a civil conspiracy, "evidence, direct or circumstantial, must be produced from which a party may reasonably infer the joint assent to the prosecution of the unlawful enterprise." *Id.* at 601, 358 S.E.2d at 153. It is clear that the use by the court of the term "unlawful" does not require a violation of criminal laws. *See Lee v. Chesterfield General Hospital, Inc.*, 289 S.C. 6, 344 S.E.2d 379 (S.C.App.1986).

The relationship between Marigold and Jackie is, to say the least, not inconsequential. Goldberg was a Jackie employee until at least November 1979. She received a $30,000 payment from Jackie in December of 1980. A substantial portion of Jackie's investors hired Marigold as their distributor. A visit with Goldberg and Marigold was part of the promotional tours conducted by Jackie. From these facts, a reasonable juror could draw the inference that Goldberg and Marigold were participants in a scheme to defraud Lynch and others similarly situated. Therefore, the court cannot dismiss the fraud claim against these defendants on the merits.

### B. Is the survival statute unconstitutional?

■ Since the court concludes that the fraud claim cannot be dismissed on its merits, and that, as applied, the survival statute precludes the maintenance of a fraud action at law after the death of the plaintiff, the court must next turn to the constitutional issues raised by plaintiff. Plaintiff asserts that the survival statute, as construed by the South Carolina Supreme Court, violates the equal protection clause of the fourteenth amendment to the United States Constitution.

The South Carolina Survival Statute provides:

Causes of action for and in respect to any and all injuries and trespasses to and upon real estate and any and all injuries to the person or to personal property shall survive both to and against the personal or real representative, as the case may be, of a deceased person and the legal representative of an insolvent person or a defunct or insolvent corporation, any law or rule to the contrary notwithstanding.

S.C.CODE ANN. § 15–5–90 (Law Co-op. 1976). Though it is far from obvious to this court that the language of the statute precludes the survival of an action at law for fraud and deceit, the South Carolina

---

**5.** By relying on the representation of the independence of Rothschild and Rose to deny summary judgment, the court does not intend the negative inference that other fraudulent statements were not made.

Supreme Court has unequivocally so held in *Mattison v. Palmetto State Life Ins. Co.*, 197 S.C. 256, 15 S.E.2d 117 (1941). In fact, the law is well settled that, in South Carolina, all causes of action survive except fraud and deceit, slander and malicious prosecution.

The rationale of the Supreme Court with respect to fraud and deceit is its conclusion that a fraud injury is neither a trespass upon real estate or an injury to the person or personal property. *Mattison* at 261–263, 15 S.E.2d at 119. Although this conclusion is less than obvious, the court is bound by the interpretation supplied by the highest court of the state. The rationale for the court's conclusion that slander and malicious prosecution do not survive is a bit more obvious because those causes of action ostensibly protect the reputation of the plaintiff. The court notes, however, that a plaintiff may recover special damages which flow from the reputational harm in some instances. At any rate, only the exclusion of fraud and deceit is before the court in the case at bar.

The equal protection challenge to the survival statute is not entirely novel. In fact, the highest courts of two states have declared their state's survival statute unconstitutional based on such challenges. In *Moyer v. Phillips*, 462 Pa. 395, 341 A.2d 441 (1975), the Supreme Court failed to discern a rational basis for Pennsylvania's survival statute's explicit exclusion of libel and slander claims. In *Thompson v. Petroff's Estate*, 319 N.W.2d 400 (1982), the Supreme Court of Minnesota declared unconstitutional the Minnesota survival statute which expressly excluded the survival of actions based on intentional torts.

The United States Supreme Court, in *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), summarized the analysis required by an equal protection challenge to a state statute. The court stated:

> In applying [the equal protection clause], this Court has consistently recognized that the Fourteenth Amendment does not deny to the States the power to treat different classes of persons in different ways. The Equal Protection Clause of that amendment does, however, deny to the states the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike."

*Id.* at 75–76, 92 S.Ct. at 253–54. The survival statute as interpreted by the court creates two classes of plaintiffs. One class of plaintiffs consists of the personal representatives of deceased persons to whom a cause of action other than malicious prosecution, slander and fraud accrued prior to death. The second class of plaintiffs consists of personal representatives of deceased persons to whom a cause of action for slander, malicious prosecution or fraud accrued prior to death. *Reed* instructs that this court must determine the objective of the survival statute and decide if the classification created therein is rationally related to that objective.

Historically, causes of action for injury to the person did not survive the death of either the plaintiff or the defendant. *Prosser and Keeton on Torts* 940 (W. Page Keeton ed. 5th ed. 1984). Professor Keeton notes:

> The historical reasons for the rule that personal tort actions died with the person of either the plaintiff or the defendant are obscure. Probably they derive from a day when little distinction was drawn between tort and crime; death of defendant minimized the capacity of the law to exact punishment, and death of the plaintiff minimized the need to substitute tort damages for vengeance. These grounds have, of course, disappeared with the establishment of tort as a separate branch of law with emphasis on compensation as well as punishment, and by today's standards the defendant's death provides no ground to protect his estate, at least in the case of personal injury torts. It is sometimes argued, however,

that if the tort claim is permitted to survive the death of the injured person the heirs get an undeserved windfall, with the concomitant cost of liability insurance. Against this it may be said that so far as survival is limited to actual economic loss, the net effect is not to protect the heirs but the creditors.

*Id.* at 942 (notes omitted).

Thus, it appears that the purpose of the survival statute was to eliminate a rule which had outlived the policies which supported it. As noted by the Honorable Sol Blatt, Jr., current Chief Judge of this district:

The advent of the Survival Statute broadened the class of tort actions that would survive the death of the injured party; this court does not feel that the Statute in any way narrowed the survival rights ... already permitted under the common law.

*Schneider v. Allstate Insurance Co.,* 487 F.Supp. 239, 244 (D.S.C.1980). In fact, the South Carolina Supreme Court has stated that "it is the general rule that any cause of action which could have been brought by the deceased in his lifetime survives to his representative under the Survival Act." *Layne v. International Brotherhood of Electrical Workers,* 271 S.C. 346, 352, 247 S.E.2d 346, 349 (1978) (citation omitted). It is clear, therefore, that the Survival Statute was intended to broaden common law survival doctrine.

In the *Schneider* case, Judge Blatt held that a cause of action against an insuror for negligent, willful or bad-faith refusal to settle within policy limits was assignable because the cause of action would have survived the death of the insured. The court recognized that the injury, though purely pecuniary, fell within the language of the survival statute. Though this court fails to recognize a distinction between the type of injury suffered in that case and the type of injury suffered here, it is bound by the South Carolina precedent which holds that causes of action for fraud and deceit do not survive.

Having determined that the purpose of the survival statute was to eradicate a common law rule which had outlived the reasons behind it and to broaden the scope of causes of action which survive, the court must turn to the classification created by the South Carolina courts to decide if that classification is rationally related to the purposes of the statute or to any other state purpose.

As noted by Judge Blatt in *Schneider,* "[I]t is extremely difficult to glean controlling principles from the cases construing the Survival Statute." *Schneider* at 244. Judge Blatt, in an earlier case, even recognized the seemingly arbitrary distinction drawn by the South Carolina courts in construing the statute:

"Why an action for a nervous breakdown caused by the publication of a false story is non-survivable, while an action for emotional upset caused by an auto-train collision does survive, is not readily apparent from the language of § 15–5–90, which expressly provides for survivability of 'causes of action for ... all injuries to the person ... any law to the contrary notwithstanding.' "

*Id.* (quoting *Burt v. Abel,* 466 F.Supp. 1234, 1239 (D.S.C.1979)).

The case which is generally cited for the proposition that causes of action for fraud and deceit do not survive, *Mattison v. Palmetto State Life Ins. Co.,* 197 S.C. 256, 15 S.E.2d 117 (1941), gives no reason for that conclusion other than stating that fraud and deceit do not fall within the language of the statute. Those cases which subsequently cite *Mattison* likewise give no justification for the rule.

This court refuses to speculate as to what considerations may underlie the distinction between fraud and other causes of action. The distinction created by the courts between claims at law and equitable claims renders the possibility of discerning a rational justification for the lack of survival of the fraud damages claim even more remote. Furthermore, the damages in a fraud case are not unlike the damage in a breach of contract case which does survive the death of the plaintiff.

In a personal injury action, the estate of a deceased plaintiff may recover losses for

conscious pain and suffering and emotional distress suffered by the deceased prior to death. In the ·fraud case, the losses are more tangible and result in a real loss to the heirs—the reduction of the estate. The survival ·of the fraud action, rather than frustrate the policies behind the survival statute, furthers those policies.

In sum, the court can glean no policy which rationally supports the distinction created by the South Carolina Supreme Court in *Mattison.* In fact, the policies which underlie the survival statute support a finding that fraud cases survive under the statute, and but for the *Mattison* case, the court would so hold. Because the South Carolina courts have interpreted the survival statute in a manner which creates a classification which is arbitrary and supported by no rational policy, this court concludes that the application of the survival statute violates the equal protection clause of the fourteenth amendment to the extent that it precludes the survival of causes of action for fraud and deceit.

Significantly, the survival statute, on its face, is broad and could conceivably include all tort actions. Thus, it is not the statute which the court finds unacceptable. Rather, it is the construction of that statute by the South Carolina courts which gives this court reason for concern. It is this interpretation only which the court finds violative of the equal protection clause of the fourteenth amendment, and the statute may stand. For the above reasons, the motion for summary judgment on Count III of the complaint will be denied.[6]

### V. Does a civil RICO claim survive the death of the plaintiff?

■ The RICO statute is silent on the issue of survivability of a civil cause of action brought under that statute. Because the RICO civil action is a creation of federal law, the question of survivability is a question of federal law. *Carlson v. Green,* 446 U.S. 14, 23, 100 S.Ct. 1468, 1474, 64 L.Ed.2d 15 (1980). The court ordi-

narily would determine whether the varying state survival statutes should control or whether a uniform federal resolution of the survival question is necessary for the vindication of ·the policies which underlie the RICO cause of action. However, because the court concludes that the result would be the same under either method of analysis, it need not reach the issue of uniformity.

In *State Farm Fire and Casualty Co. v. Caton's Estate,* 540 F.Supp. 673 (N.D.Ind. 1982), the court held that the RICO cause of action, including the trebling of damages, survived the death of the RICO defendant. The Court noted that Congress mandated that the provisions of Title IX should be "liberally construed to effectuate its remedial purposes." *Id.* at 681 (citing 84 Stat. 947). The Supreme Court recognized in *Russello v. United States,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983), that "[t]he legislative history clearly demonstrates that the RICO statute was intended to provide new weapons of unprecedented scope for an assault upon organized crime and its economic roots." *Id.* at 26, 104 S.Ct. at 302.

These policies are obviously enhanced by the survival of the RICO action. The enhancement of these policies is magnified when the plaintiff, and not the defendant, has predeceased the resolution of the dispute. The court adopts the reasoning of the court in *State Farm Fire and Casualty Co.* and concludes that, applying federal survival principles, the RICO cause of action in this case does survive the death of Lynch.

Furthermore, the South Carolina courts have been particular about refusing to create any exceptions to the survival statute other than slander, malicious prosecution and fraud and deceit. In the *Schneider* case, Judge Blatt noted, "In the more than eighty-five years that the Survival Statute has been in existence, no other exceptions have been created. Thus, it may be inferred ... that these are the exclusive ex-

6. The arguments made herein apply equally to the cause of action for constructive fraud or negligent misrepresentation, so the court con-

cludes that these theories of recovery also survive the defendants' motion.

ceptions under the law of South Carolina." *Schneider* at 245. In *Layne v. International Brotherhood of Electrical Workers,* 271 S.C. 346, 247 S.E.2d 346 (1978), the South Carolina Supreme Court held that an action for actual and punitive damages survived the death of the plaintiff. The court saw no reason to circumvent the general rule that causes of action survive even though both actual and punitive damages were sought in that case. *Id.* at 351–53, 247 S.E.2d at 349.

For the above reasons, we conclude that the RICO cause of action would survive under South Carolina law. Since the court also concluded that the cause of action would survive under federal survival law, the court will not grant summary judgment on Count V of the complaint on survivability grounds.

*VI. Is the RICO cause of action time-barred?*

The defendants argue that the RICO cause of action is time-barred under the applicable statute of limitations and assert that the appropriate limitations period is the South Carolina statute of limitations for an action upon a statute for a penalty or forfeiture. Thus, defendants argue that the appropriate limitations period is the three-year period contained in S.C.CODE ANN. § 15–3–540(2) (Law Co-op.1976).

The United States Supreme Court has, however, recently determined the appropriate statute of limitations for the civil RICO cause of action. In *Agency Holding Corp. v. Malley-Duff & Assoc., Inc.,* — U.S. —, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987), the Court held that the four-year statute of limitations contained in the Clayton Act was appropriate for RICO causes of action. In their memorandum in support of their motion for summary judgment, defendants claim that the statute of limitations was tolled until no later than September 1981. The action was filed on July 5, 1985, and is apparently within the statute even assuming the facts as alleged by defendants are correct. Thus, summary judgment cannot be granted on the RICO cause of action on untimeliness grounds.

*VII. Is dismissal of the RICO claim proper on the pleadings?*

The first ground on which defendants seek dismissal is that the complaint fails to allege the predicate acts which constitute a pattern of racketeering activity with the specificity required by Fed.R. Civ.P. 9(b). This rule has been held to apply to pleading predicate acts of mail and wire fraud in a RICO case. *Moss v. Morgan Stanley Inc.,* 719 F.2d 5, 19 (2d Cir. 1983), *cert. denied sub nom Moss v. Newman,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984); *see also Schreiber Distributing Co. v. Serv-Well Furniture Co., Inc.,* 806 F.2d 1393, 1400 (9th Cir.1986).

Plaintiff fails in her complaint to allege specific uses of the mails and wires in furtherance of the scheme to defraud Lynch and others. The language of the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343 (1984), makes illegal the use of the mails and wires in furtherance of a fraudulent scheme. It does not appear necessary, therefore, that any misrepresentations be made by the mails and wires. Rather, it is necessary to allege only the instances in which the mails and wires facilitated the accomplishment of the objective of a fraudulent scheme. In fact, in *United States v. Locklear,* 829 F.2d 1314 (4th Cir.1987), the court stated:

> "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." The government need not show that [the defendant] mailed anything himself, nor that he intended the mails to be used to carry out the fraud.

*Id.* at 1318 (citations omitted).

Thus, while it is not necessary for the plaintiff to plead misrepresentations made through use of the mails and interstate wires, it is necessary for her to allege specific instances of use of the mails and wires in furtherance of the fraudulent scheme. Because the complaint fails in this regard, the court agrees with the de-

fendants that the complaint is deficient. Rather than dismiss the complaint, however, the court directs the plaintiff to amend the complaint to comply with this order.[7] After the complaint has been amended, the court will, upon motion of the defendants, reconsider the sufficiency of the complaint and address the other arguments advanced by defendants in their brief.

### VIII. Is summary judgment proper on Jackie's counterclaim?

 The court has already concluded that factual issues concerning fraud exist in the case which preclude summary judgment on the fraud claim. For the same reason, summary judgment is not proper on Jackie's counterclaim to collect on the $450,000 note. Whether or not the signing of the note was fraudulently induced will be left to the jury to decide.

### IX. Conclusion

Having conducted a de novo review of those portions of the Magistrate's report to which specific objections were made, the court accepts in part, rejects in part and modifies in part the recommendation of the Magistrate which is made a part of this order by specific reference. It is, therefore,

ORDERED, that the motions of defendants Jackie Fine Arts, Inc., Herman Finesod, Marilyn Goldberg, and Marigold Enterprises, Ltd. for summary judgment be, and the same are hereby, granted as to Counts I, II and IV of the seconded amended complaint. It is

ORDERED FURTHER, that the motions of defendants Jackie Fine Arts, Inc., Herman Finesod, Marilyn Goldberg, and Marigold Enterprises, Ltd. for summary judgment be, and the same are hereby, denied as to Counts III and V of the complaint. It is

ORDERED FURTHER, that plaintiff Phyllis Faircloth shall, within twenty (20) days of the entry of this order, amend the complaint with respect to Count V to more specifically plead the allegations contained therein in compliance with Fed.R.Civ.P. 9(b) and this order. It is

ORDERED FURTHER, that the motion of Jackie Fine Arts, Inc. for summary judgment on its counterclaim be, and the same is hereby, denied.

AND IT IS SO ORDERED.

### ORDER

### ON PRO SE MOTIONS FOR SUMMARY JUDGMENT

This matter is before the court on motions of defendants Sigmund Rothschild and F. Peter Rose for summary judgment. The motions were filed by the parties acting pro se on March 19, 1987. The memorandums in support of each motion merely adopt the reasoning of the motion for summary judgment and the memorandum in support thereof filed by defendants Jackie Fine Arts, Inc. (Jackie) and Herman Finesod (Finesod) on March 16, 1987.

The motion of Jackie and Finesod and a motion for summary judgment filed by the remaining two defendants, Marilyn Goldberg and Marigold Enterprises, Ltd., were heard by a United States Magistrate who issued a report and recommendation to this court. The parties filed extensive objections to the report and recommendation, and this court, therefore, conducted a de novo review of the case and issued an order on March 30, 1988. In the order of March 30, 1988, the court considered each of the arguments raised by Jackie and Finesod in their motion for summary judgment. Since the motions of Rose and Rothschild raise no issues not addressed by the court in its previous order, the court

---

7. The court does not mean to be telling plaintiff to supply another lengthy hodgepodge of information. Rather, the court seeks clear and concise allegations of predicate acts in furtherance of the fraudulent scheme alleged. Furthermore, the court is very aware of the onerous "pattern" requirement which has developed in the Fourth Circuit and has most recently been reaffirmed in *Flip Mortgage Corp. v. McElhone,* 841 F.2d 531 (4th Cir.1988), but the court prefers to evaluate the claim after receiving a concise pleading which sets forth specifically the predicate acts of racketeering activity and the pattern which they form.

will dispose of these motions in the same manner as it disposed of the Jackie/Finesod motion. For the reasons contained in the court's order of March 30, 1988, which is made a part of the present order by specific reference, it is

ORDERED, that the motions of defendants Sigmund Rothschild and F. Peter Rose for summary judgment be, and the same are hereby, granted as to Counts I, II, and IV. It is

ORDERED FURTHER, that the motions of defendants Sigmund Rothschild and F. Peter Rose for summary judgment be, and the same are hereby, denied as to Counts III and V. It is

ORDERED FURTHER, that plaintiff Phyllis Faircloth shall amend the complaint with respect to Count V in accordance with the terms of the order of this court filed March 30, 1988.

AND IT IS SO ORDERED.